SECOND DIVISION
April 19, 2011

No. 1-09-1466

THE PEOPLE OF THE STATE OF ILLINOIS,  ) Appeal from the
                ) Circuit Court of
    Plaintiff-Appellee,     ) Cook County
                )
                )
    v.           ) No. 04 CR 2958
                )
                )
WILLIE HAYES,        ) Honorable
                ) Michele M. Simmons,
    Defendant-Appellant.   ) Judge Presiding.

JUSTICE HARRIS delivered the judgment of the court, with opinion.
Justices Karnezis and Connors concurred in the judgment and opinion.

**OPINION**

Defendant, Willie Hayes, was convicted after a jury trial of first degree murder and

concealment of a homicidal death. He was sentenced to consecutive prison terms of 36 and 4

years' imprisonment. On appeal, he raises the following issues: (1) whether the trial court erred

when it refused to instruct the jury on involuntary manslaughter; (2) whether defendant was

denied a fair trial based on a statement the prosecutor made to the jury in rebuttal closing

argument; (3) whether this court should excuse defendant's procedural default and review, under

the plain error doctrine, whether the trial court violated Illinois Supreme Court Rule 431(b) (eff.

May 1, 2007) when instructing the jury; (4) whether defendant's sentence was excessive; and (5)

whether defendant is entitled to an additional seven days of presentence credit for time spent in

custody prior to sentencing, for a total of 1,944 days. We find that: (1) the trial court did not

abuse its discretion in denying defendant's request to instruct the jury on involuntary manslaughter because he cannot show his actions were "reckless"; (2) the prosecutor's alleged improper comment during rebuttal closing argument was brief and isolated and did not substantially prejudice defendant such that the verdict would have been different without the improper comment; (3) defendant is procedurally defaulted from raising the issue of whether the trial court violated Supreme Court Rule 431(b); (4) the trial court did not abuse its discretion in sentencing defendant as the record confirms the sentencing judge balanced the goals of retribution and rehabilitation of defendant; and (5) defendant's mittimus should be modified to reflect the amount of 1,943 days of presentencing credit, which does not include the day of sentencing.

## JURISDICTION

The circuit court sentenced the defendant on June 2, 2009, and he timely filed his notice of appeal on June 5, 2009. Accordingly, this court has jurisdiction pursuant to article VI, section 6, of the Illinois Constitution and Illinois Supreme Court Rules 603 and 606, governing appeals from a final judgment of conviction in a criminal case entered below. Ill. Const. 1970, art. VI, §6; Ill. S. Ct. R. 603 (eff. Oct. 1, 2010); R. 606 (eff. Mar. 20, 2009).

## BACKGROUND

Defendant was arrested and taken into custody on January 8, 2004, for the murder of Nicole Boyd. Prior to trial, the court denied defendant's motion to quash arrest and his two motions to suppress evidence. Following a jury trial, defendant was found guilty of first degree murder and concealment of a homicidal death. Defendant was sentenced on May 4, 2009, to consecutive sentences of 36 years for first degree murder and 4 years for concealment of a

No. 1-09-1466

homicidal death.

## Jury Selection

At the beginning of the jury selection, the following colloquy took place between the trial court and the first 14 potential jurors:

"Do all of you know or understand that the defendant is presumed innoc[ent]of these charges and he do[es] not have to offer any evidence in his own behalf, but must be proven guilty beyond a reasonable doubt by the State? If you all know that or understand that principal of law, please raise your right hand.

For the record, everyone has raised their right hand that I posed the question to.

If the defendant decides not to testify in his own behalf, would any of you hold that against defendant? If the defendant decides not to testify in his own behalf, would any of you hold it against the defendant? If so, please raise your right hand.

For the record, no one has raised their hand.

Let me take that even a bit further. Do all of you know and understand that if [in] fact []defendant decides not to testify [o]n his own behalf, you as a juror are not to hold it against the defendant. If you can follow that, please raise your right hand.

For the record, everyone has raised their right hand."

3

No. 1-09-1466

Out of the first group of 14 potential jurors, 9 were selected for the jury. The court then called 14 more potential jurors, and engaged them as follows:

"Do all of you understand that the defendant is presumed innocent and that he does not have to offer any evidence in his own behalf, but must be proven guilty beyond a reasonable doubt by the State? Do all of you know and understand that? If so, please raise your hand.

For the record, everyone has raised their right hand that I've posed the question to.

If the defendant decides not to testify in his own behalf, would any of you hold that against defendant? Would any of you hold it against the defendant if he decided not to testify in his own behalf?"

One potential juror, William Gaudry, raised his hand. The court then stated:

"Let me ask that question of everybody. Do all of you understand that if in fact the defendant does not testify in his own behalf, you are not to hold that against him? Do you all know and understand and can you follow that? If you so, please raise your right hand.

All right. Everyone has raised their hand outside of Mr. Guadry."

4

No. 1-09-1466

Mr. Gaudry was excused. From this second group of potential jurors, the final four jurors and the first alternate were selected. The court then called four more potential jurors into the jury box and stated:

"Do all of you understand that the defendant is presumed innocent and that he does not have to offer any evidence in his own behalf, but must be proven guilty beyond a reasonable doubt by the [S]tate? If all of you know or understand that proposition of law, please raise your right hand to indicate to me you know and understand what I've just said.

For the record, everyone has raised their hand.

If the defendant does not decide to testify in his own behalf, would any of you hold that against the defendant. If so, please [raise] your right hand.

For the record, no one has raised their right hand.

Do all of you know and understand that if [in] fact you are not to hold it against a defendant if he decides not to testify in this – his own behalf. If you can follow that, please raise your hand.

For the record, everyone has raised their right hand."

Out of the final four potential jurors, the second alternate juror was selected.

Trial

Mary Boyd, the mother of the victim, Nicole Boyd, testified that she contacted the

5

Chicago Heights police department to report her daughter as missing. Chicago Heights Detective Michael Leuser testified that on January 8, 2004, he and his partner, Officer Murtagh, went to Nicole Boyd's apartment in response to a missing person report. Defendant answered the door. The officers asked him if they could come in and talk about Nicole. He let the officers into the apartment. Officer Murtagh asked him several questions concerning Nicole's whereabouts, to which he responded that they had gotten into an argument, that she left, and that he had not seen her since January 4, 2004. Officer Leuser noticed a large red stain, along with a rope, on the couch. He testified the stain looked like a bloodstain. Officer Murtagh looked around the apartment for Nicole with defendant's permission. When Officer Murtagh returned to the living room, he advised Officer Leuser to look into the bathroom. Officer Leuser testified that in the bathroom, he saw red-stained clothing and tissues, a red stain on the shower curtain and stains along the walls and the bathtub. Officer Leuser testified that near the drain of the bathtub, he noticed hair and red skin-like tissue. The officers took defendant into custody.

Detective Lou Alessandrini testified that on January, 8, 2004, he and Detective Mikal El-Amin interviewed defendant at the Chicago Heights police station. He told the detectives that he had had an argument with Nicole, with whom he had been living with for a few weeks. When asked where Nicole was, he answered that he did not know, they had gotten into a verbal argument, and that he had not seen her in a few days. Detective Alessandrini testified that he left the interview with defendant for a time and when he returned, defendant offered a second version as to Nicole's whereabouts. He testified that defendant told them that he had been in an argument with Nicole because she wanted to end the relationship. He told the detectives Nicole had

slapped him and that he had slapped her back. Nicole's lip became bloody, so she went to the kitchen to get some water. He told the detectives that when he returned to the living room, Nicole had a knife and a struggle ensued. He said that "they struggled, they fell back onto the couch; at which time, the knife went into [Nicole's] neck." Nicole was bleeding, so he put her in the bathtub and turned on the cold water. He left and when he came back Nicole was dead. He told the detectives he removed Nicole's clothing, put her body in a plastic bag, and placed the plastic bag in a dumpster in an alley a block or two away from her apartment. The detectives and defendant then drove to the alley behind Nicole's apartment where, after searching several dumpsters, Detective Alessandrini found a trash bag with a leg sticking out. The police also searched nearby garbage cans where they found a bloody blanket, a bloody pillow, and bloody articles of clothing.

Detective El-Amin testified that during the course of his interviews with defendant, defendant's version of what happened changed several times. Defendant told him that during the argument with Nicole, he hit her in the chest and she began to cough up blood. He then put her into the shower, panicked and left the house. He claimed he was gone for two hours because he went to talk with a minister in Harvey, Illinois. When he came back, Nicole was gone. Detective El-Amin testified that defendant changed his story. In his second version, defendant claimed that Nicole tried to leave the apartment and he tried to stop her. She then slapped him, he got angry and slapped her back. He went upstairs to prepare salt water for Nicole to wash her mouth out. As he did, Nicole came at him from behind with a knife. A physical altercation ensued. Detective El-Amin testified defendant told him that "[w]hile they're wrestling, they fall onto the couch. And

when they fall into the couch - - onto the couch, the knife goes into Nicky's neck." He told Detective El-Amin he pulled the knife out of Nicole's neck and took her upstairs, intending to cover her neck with clothing or towels, but she was bleeding too much. He then put her in the shower, panicked and left the apartment. He contemplated calling 911, but after 15 or 20 minutes returned to the house and saw that Nicole was dead. He then unclothed Nicole, put her in a garbage bag and dumped her by a dumpster two blocks away. Detective El-Amin testified that after retrieving Nicole's body, they returned to the police station, where he asked defendant if he wanted to tell him what really happened. The defendant responded that everything was the same but instead of the knife accidentally going into Nicole's neck, he "kind of forced it in" because Nicole was saying "mean and hurtful" things to defendant. He said that he only stabbed Nicole once, and the knife could be found inside the bag with Nicole. The knife was not found in the bag that held Nicole's body. The defendant was asked if he wanted to add anything else to his story, to which he replied "No."

Assistant State's Attorney (ASA) Nick D'Angelo testified that he subsequently interviewed the defendant and learned that the knife could be recovered on the roof of Nicole's apartment. Defendant initially stuck to his original story telling him he had put the knife he stabbed Nicole with in the plastic bag with her body, but when he informed defendant he believed he was lying about the whereabouts of the knife, defendant admitted that he was lying and said that he took the knife, went outside, and threw it on the roof. The knife was recovered from the roof of Nicole's apartment after which defendant was asked to again tell his version of the events. Defendant said that Nicole and he were arguing because Nicole wanted defendant to move out of

her apartment. Nicole slapped him and he slapped her and then she picked up a knife from the kitchen table. Nicole went at him with the knife and he grabbed her by the wrist. They then stumbled into the living room, fell over the couch, and he fell on top of her, with the knife going into her neck.

Dr. Kendall Crowns, an expert in the field of forensic pathology, testified regarding the autopsy he performed on Nicole's body. He testified that Nicole weighed 95 pounds and was 4 feet, 10 inches tall. She had several stab and incise wounds on her body. Nicole had incise wounds on the right side of her forehead and right side of her face. She had two stab wounds; one on the left side of her face that involved the skin and subcutaneous tissue of the area, the musculature of the left side of the face, and a branch of the carotid artery, and the other to the right side of her neck that involved the skin, subcutaneous tissue of the area, the musculature of the neck and the right jugular vein. She had two small petechial hemorrhages of the white of her left eye, which he stated could be associated with compressional trauma to the neck. On the inner surface of her left upper lip and lower left lip she had purple/red bruising. Dr. Crowns testified that on Nicole's right forearm, she had two incise wounds and on her right hand, an incise wound and an abrasion, which are the types of injuries received when a victim is attempting to defend against a knife with his or her arms and hands. He opined that the cause of Nicole's death was multiple stab and incise wounds and that she had used her right arm and hand to fend off the attack.

After the autopsy ASA D'Angelo interviewed defendant again. He told defendant he believed he was lying based on his talk with the medical examiner and asked defendant if he

wanted to tell him what really happened. Defendant agreed to a videotaped statement, which was played to the jury. In it he claimed that he and Nicole had gotten into an argument. He grabbed Nicole to stop her from leaving the apartment. She slapped him and he slapped her back with an open hand. When he hit her, she began bleeding from the mouth. He went to get her water and she came at him with a knife. He then grabbed her wrist and they ended up in the living room. As he was trying to shake the knife out of her hand, the knife fell between the two of them. He picked up the knife with his left hand, as they exchanged words. He then "grazed" one side of her neck and the knife "punctured a little through." He then admitted he stabbed Nicole twice, once on each side of her neck, and that she got cuts and scrapes on her forehead. He said the knife went into her three or four inches and that when he removed it from her neck, blood began gushing out. He was unable to stop the bleeding with a blanket. He helped her walk to the bathroom, where he put her in the bathtub and turned on the cold water. He grabbed a towel and told her to put it over the wound. He left her in the tub and exited the apartment. He went up the street to a laundromat. There he went to a pay phone, but got scared and could not bring himself to dial the phone. After 15 minutes, he returned to the apartment. Nicole was still in the bathtub, where she eventually died.

Defendant then cleaned up the blood with a mop and smoked a cigarette. He stayed in Nicole's apartment because he had no where else to go and he had job interviews lined up. He then undressed her body. He put her bloody clothes and blanket in a trash bag. He put the trash bag in a trash can in the backyard and then sat for a couple of hours. He then put Nicole's body in a plastic bag and put the bag in a dumpster. He threw the knife on the roof of the apartment.

Four or five days later the police arrived.

The parties stipulated that a sample of the blood extracted from the couch matched Nicole's DNA profile. Brent Cutro, a latent print examiner from the Department of State Police, testified that the knife recovered from the roof of Nicole's apartment contained defendant's fingerprints.

### Jury Instructions

During the conference on jury instructions, defendant requested instructions on second degree murder based on mutual combat provocation and involuntary manslaughter. Over the State's objections, the trial court instructed the jury on second degree murder. Defendant argued that there was some evidence of recklessness. The court denied defendant's requested instruction on involuntary manslaughter, finding "[t]here is no evidence put forth to this jury that this was an unintentional act."

### Closing Arguments

During the State's rebuttal closing argument, the assistant State's Attorney argued:

> "This is first degree murder, it's not second degree murder.
> I will tell you this right now ladies and gentlemen. If you want to
> buy his load of baloney, if you want to think that he met his burden
> that this is second degree murder, let him walk. Don't even sign it.
> Let him walk out that door. If that is what you think, that this is
> anything other than first degree murder, sign it not guilty. You let
> him walk. That is a slap on the wrist."

Defense counsel objected, and the court overruled the objection.

Verdict and Sentencing

The jury found defendant guilty of first degree murder and concealment of a homicidal death. At sentencing, defendant presented the testimony of his mother, his younger sister, and his younger brother. Defendant's mother testified that defendant had an unstable childhood, that his father was abusive, and that she had a substance abuse problem and had abandoned the family for years. Defendant's younger sister and brother testified that defendant cared for them when their parents were absent, by providing food and getting them to school on time. Defendant spoke, expressing remorse for Nicole's death and taking full responsibility for his actions. Defense counsel argued in mitigation that defendant had a troubled upbringing and raised himself. Defendant's presentence investigation report noted that defendant made efforts to obtain his GED and that he had worked at various fast-food restaurants.

In aggravation, the State presented the victim impact statement of Nicole's mother and her son. The State presented evidence that defendant was adjudicated a delinquent in 1997 for vehicular hijacking and sentenced to the Illinois Department of Corrections.

The trial court stated, "I have heard all of the evidence in this case, I have considered the matters that I have heard in aggravation and mitigation." In regard to matters the trial court considered in mitigation, the trial court noted the testimony of defendant's mother and how defendant and his mother did not have a close relationship. The trial court also recognized that defendant had been raised "in and out of family member[s'] homes" as well as by the Department of Children and Family Services. The trial court also mentioned that defendant helped raise family

members and worked at multiple fast-food restaurants. In aggravation, the trial court noted that Nicole was a mother of three children and addressed the severity of Nicole's injuries. The trial court also took into account the way defendant treated Nicole's body after she was dead, by throwing it in the dumpster and then staying in her apartment. The trial court also considered the presentence investigative report, which indicated that defendant did not have any criminal history as an adult. After considering the factors in aggravation and mitigation, the statements of defendant and the arguments of counsel, the trial court sentenced defendant to a term of 36 years in prison for first degree murder and a consecutive sentence of 4 years for concealment of a homicidal death. Defendant timely appealed.

## ANALYSIS

Defendant raises several arguments on appeal. We consider each argument in turn.

### Involuntary Manslaughter Instruction

Defendant first argues that he should be granted a new trial because the trial court erred when it denied his request to instruct the jury on involuntary manslaughter, as there was evidence that defendant's conduct was reckless. The State argues that there is no evidence of recklessness to justify the giving of an involuntary manslaughter instruction.

Whether to give a jury instruction is a decision resting within the sound discretion of the trial court. *People v. Jones,* 219 Ill. 2d 1, 31 (2006). It is proper to instruct the jury on a lesser offense where there is some credible evidence to support that instruction. *Id.* It is an abuse of the trial court's discretion when it fails, despite evidentiary support, to give an instruction on involuntary manslaughter. *Id.* Further, "[w]hether an involuntary manslaughter instruction is

13

warranted depends on the facts and circumstances of each case." *Id.*

Involuntary manslaughter is committed when a defendant performs acts that are "likely to cause death or great bodily harm to some individual, and he performs them recklessly." 720 ILCS 5/9-3(a) (West 2004). Recklessness is defined as follows:

> "A person is reckless or acts recklessly, when he consciously
>
> disregards a substantial and unjustifiable risk that circumstances
>
> exist or that a result will follow, described by the statute defining
>
> the offense; and such disregard constitutes a gross deviation from
>
> the standard of care which a reasonable person would exercise in
>
> the situation." 720 ILCS 5/4-6 (West 2004).

In other words, "a defendant acts recklessly when he is aware that his conduct might result in death or great bodily harm, although that result is not substantially certain to occur." *People v. DiVincenzo,* 183 Ill. 2d 239, 250 (1998).

Our supreme court, in *People v. DiVincenzo,* stated factors that, although not dispositive, suggest whether a defendant's actions were reckless such that a jury instruction on involuntary manslaughter is proper. Specifically:

> "(1) the disparity in size and strength between the defendant and the
>
> victim [citations]; (2) the brutality and duration of the beating, and
>
> the severity of the victim's injuries [citations]; and (3) whether a
>
> defendant used his bare fists or a weapon, such as a gun or a knife
>
> [citations]. In addition, an involuntary manslaughter instruction is

> generally not warranted where the nature of the killing, shown by
> either multiple wounds or the victim's defenselessness, shows that
> defendant did not act recklessly." *Id.* at 251.

To prove that an instruction of involuntary manslaughter was required, "defendant must point to some evidence of something he did recklessly." *People v. Castillo,*188 Ill. 2d 536, 541-42 (1999); *Jones*, 219 Ill. 2d at 32.

In claiming the trial court erred in denying his request for an instruction on involuntary manslaughter, defendant relies on the evidence presented through the testimony of detectives Alessandrini and El-Amin regarding defendant's second version of the incident. Detective Alessandrini testified that, "according to [defendant], Nicky had a knife and a struggle ensued. He said, that they - - they struggled, they fell back onto the couch; at which time, the knife went into Nicky's neck." Detective El-Amin testified to the same version of defendant's story, stating: "While they're wrestling, they fall onto the couch. And when they fall into the couch - - onto the couch, the knife goes into Nicky's neck."

Applying the factors enumerated in *DiVincenzo* to the evidence, we find defendant's actions were not reckless and, thus, an involuntary manslaughter instruction was not warranted. The first factor, the size and strength of the victim compared to that of defendant, does not show defendant acted recklessly. *DiVincenzo,* 183 Ill. 2d at 251 ("the disparity in size and strength between the defendant and the victim" is a factor that suggests whether a defendant's actions were reckless). The autopsy of the victim, Nicole, revealed that she weighed 95 pounds and stood 4 feet, 10 inches tall. The record shows that defendant weighed 150 pounds and stood 5

feet, 3 inches tall at the time of the incident. Defendant weighed 55 pounds more than and stood 5 inches taller than Nicole. This disparity in height and weight between defendant and the victim does not indicate recklessness on the part of defendant.

Next, the nature of the incident and the severity of Nicole's injuries do not support a conclusion of reckless behavior. *Id.* ("an involuntary manslaughter instruction is generally not warranted where the nature of the killing, shown by either multiple wounds or the victim's defenselessness, shows that defendant did not act recklessly"). Nicole's injuries show the severity of the attack, and her autopsy revealed that she suffered multiple wounds to her body. She had two stab wounds, one on the left side of her face and one on the right side of her neck, which the defendant admits. She had two small petechial hemorrhages in her left eye. She had incise wounds on her right arm. Dr. Crowns, who performed the autopsy, opined that the cause of death was multiple stab and incise wounds and that Nicole used her right arm to fend off the attack. Nicole's injuries do not indicate recklessness but, rather, support the conclusion that defendant intentionally caused a stab wound to the left side of her face, a stab wound to the right side of her neck and incise wounds on her right arm. The nature of Nicole's injuries does not suggest that defendant acted recklessly.

Finally, in the version of defendant's story that he points to as evidence of reckless behavior, it is uncontradicted that he used a weapon, the knife, on Nicole. This factor indicates he did not act recklessly. *Id.* ("whether a defendant used his bare fists or a weapon, such as a gun or a knife" suggests whether defendant's actions were reckless). The use of a deadly weapon such as a knife in this case, as opposed to the use of bare fists, indicates that defendant did not act

No. 1-09-1466

recklessly.

Applying the *DiVincenzo* factors to the evidence that defendant relies on in arguing for an involuntary manslaughter instruction shows that his actions were not reckless. 720 ILCS 5/9-3(a) (West 2004). (Involuntary manslaughter is committed when a defendant performs acts that are "likely to cause death or great bodily harm to some individual, and he performs them recklessly ***.").

Defendant argues that his actions were similar to the actions of the defendant in *People v. Whiters*, 146 Ill. 2d 437 (1992), and urges this court to reverse his convictions and remand for a new trial. However, the facts of *Whiters* are distinguishable. In *Whiters*, the defendant pointed a knife at the victim during an argument. *Id.* at 440. The victim ripped a phone from the wall. *Id.* The victim then moved toward the defendant, and the defendant stabbed the victim in the abdomen. *Id.* The defendant immediately called for help and screamed that she did not mean to hurt the victim. *Id.* The appellate court concluded that the above acts of the defendant, "if believed by the jury, could reasonably be ascertained to be reckless conduct." *Id.* at 441. Our supreme court agreed, holding that whether the conduct of the defendant was reckless "was a question of fact for the jury and that the jury should have been instructed on involuntary manslaughter." *Id.*

In this case, although defendant and Nicole were arguing, defendant's actions were not reckless. Rather, they appear calculated and executed with thought. Instead of calling for help, screaming that he did not mean to hurt the victim and calling an ambulance like the defendant in *Whiters*, defendant methodically put Nicole's fatally injured body in a bathtub and exited her

17

apartment. He returned 15 minutes later. He mopped up the blood and smoked a cigarette. He undressed her body and put her bloody clothing and blanket in a trash bag and into a trash can. He then sat for a couple of hours. Then he put her naked body in a trash bag and placed it in an alley dumpster. Finally, he disposed of the knife by throwing it up on the roof of the building. He did nothing of a mitigating nature for four or five days and then the police confronted him. Defendant's conduct cannot be said to "reasonably be ascertained to be reckless conduct." *Id.* Unlike the defendant's actions in *Whiters,* defendant in this case offers no evidence that could support a finding that his conduct was reckless where the victim, with multiple stab wounds, was left to die alone in a bathtub and then her body was later disposed of in a dumpster in an alley.

Based on the facts and circumstances of this case, defendant was not entitled to an instruction on involuntary manslaughter because he cannot show that he performed the acts "recklessly." 720 ILCS 5/9-3(a) (West 2004). Accordingly, we find the trial court did not abuse its discretion in denying defendant's request to instruct the jury on involuntary manslaughter.

The State's Rebuttal Closing Argument

Defendant next argues that he was denied a fair trial when the prosecutor, during rebuttal closing arguments, told the jury,

> "This is first degree murder, it's not second degree murder.
> I will tell you this right now, ladies and gentlemen. If you want to
> buy this load of baloney, if you want to think that he met his burden
> that this is second degree murder, let him walk. Don't even sign it.
> Let him walk out that door. If that is what you think, that this is

anything other than first degree murder, sign it not guilty. You let

him walk. That is a slap on the wrist."

Defendant argues that this statement minimized the seriousness of a finding of second degree murder and improperly commented on possible sentences. The State contends the prosecutor's comments were not improper as they did not comment on sentencing but, rather, sought to show that the evidence presented proved defendant was either guilty of first degree murder or not guilty. The State also argues that the comment was brief and isolated, and that because the jury was properly instructed on the law, any error was harmless.

Due to an apparent conflict between two Illinois Supreme Court cases, *People v. Wheeler,* 226 Ill. 2d 92, 121 (2007) and *People v. Blue,* 189 Ill. 2d 99, 128 (2000), it is not clear what the proper standard of review is when reviewing improper remarks made during closing arguments. *People v. Raymond*, 404 Ill. App. 3d 1028, 1059-60 (2010) (stating that in *Wheeler,* the supreme court utilized a *de novo* standard of review, but that in numerous other supreme court cases, including *Blue*, the court applied an abuse of discretion standard). In this case, as in *Raymond*, we do not need to determine the proper standard of review because the result would be the same under either a *de novo* or an abuse of discretion standard. *Raymond,* 404 Ill. App. 3d at 1060 (noting that this was the same approach taken by this court in *People v. Phillips,* 392 Ill. App. 3d 243, 275 (2009), *People v. Johnson,* 385 Ill. App. 3d 585, 603 (2008), and *People v. Robinson*, 391 Ill. App. 3d 822, 840 (2009)).

In making a closing argument, a prosecutor is allowed a great amount of latitude. *People v. Cisewski*, 118 Ill. 2d 163, 175 (1987). We must "consider the closing argument as a whole,

rather than focusing on selected phrases or remarks." *People v. Runge*, 234 Ill. 2d 68, 142 (2009); see also *Cisewski,* 118 Ill. 2d at 175-76 ("In reviewing allegations of prosecutorial misconduct, the closing arguments of both the State and the defendant must be examined in their entirety and complained-of comments must be placed in their proper context."). Further, "[t]o constitute reversible error, the complained-of remarks must have resulted in substantial prejudice to the accused, such that absent those remarks the verdict would have been different." *Cisewski,* 118 Ill. 2d at 175. The remarks must be a material factor in defendant's conviction. *People v. Robinson,* 157 Ill. 2d 68, 84 (1993). A significant factor in determining the impact of an improper comment on a jury verdict is whether "the comments were brief and isolated in the context of lengthy closing arguments." *Runge,* 234 Ill. 2d at 142.

In considering the closing arguments in their entirety, we find that the prosecutor's comment did not substantially prejudice defendant such that a new trial is warranted. *Cisewski,* 118 Ill. 2d at 176. Although the State's comment was not proper, the comment was brief and isolated. *Runge*, 234 Ill. 2d at 142 (a significant factor in determining the impact of an improper comment on a jury verdict is whether "the comments were brief and isolated in the context of lengthy closing arguments"). The transcript of the State's rebuttal closing argument was over 30 pages long, and the complained-of comment was the only improper comment. We cannot say that the verdict would have been different had the prosecutor not made the remarks. *Cisewski,* 118 Ill. 2d at 175.

Additionally, this was not a closely balanced case and defendant has failed to show that the isolated comment was material to his conviction. The evidence of provocation by mutual combat

was not strong. The evidence showed that defendant was the instigator of the combat. *People v. Delgado,* 282 Ill. App. 3d 851, 859 (1996) ("one who instigates combat cannot rely on the victims' response as evidence of mutual combat sufficient to mitigate the killing of the victims from first-degree murder to second-degree murder"). Both defendant's second version of the events, as told through the testimony of Detective El-Amin, and defendant's videotaped statement reveal that defendant instigated the combat by stopping Nicole from leaving the house. The only evidence that defendant was not the instigator was from defendant's first version of the events where he claimed that there was an argument and Nicole left. Defendant later changed this story several times.

Defendant relies on *People v. Crossno,* 93 Ill. App. 3d 808 (1981), *People v. Howard,* 232 Ill. App. 3d 386 (1992), and *People v. Sutton*, 316 Ill. App. 3d 874 (2000), in arguing that a new trial is warranted. However, these cases are distinguishable because in those cases the evidence was closely balanced. See *People v. Rios*, 318 Ill. App. 3d 354, 365 (2000) (distinguishing *Crossno* and *Howard* because "the appellate court's ruling was premised on its finding that the evidence was so closely balanced that the prosecutor's comment could have affected the outcome of the trial"); *Sutton*, 316 Ill. App. 3d at 896 ("[t]he cumulative effect of th[e] improper comment, together with the improper cross-examination of defendant *** warrants reversal"). In this case, as discussed above, the evidence of mitigation for second degree murder was not closely balanced.

Based on our consideration of the whole of rebuttal closing argument, we cannot say that defendant has shown that he was substantially prejudiced by the brief and isolated comments by

21

prosecutor, and thus, the alleged error was harmless. Although we believe that the prosecutor should not have used the language in question, we cannot find that defendant has shown substantial prejudice such that the verdict would have been different had the prosecutor not made the remark. See *Cisewski,* 118 Ill. 2d at 178 ("Although we believe this comment would have been best left unsaid by the prosecutor, in light of the overwhelming evidence of defendant's guilt, we cannot say that the verdict would have been different absent this single isolated remark.").

Supreme Court Rule 431(b)

Defendant next argues the trial court failed to comply with the admonishment requirements of Supreme Court Rule 431(b) when questioning potential jurors during *voir dire*.[1] Ill. S. Ct. R. 431(b) (eff. May 1, 2007). Specifically, defendant contends the trial court improperly combined three of the principles of Rule 431(b) into one question, failed to ascertain whether the potential jurors "accepted" the principles of Rule 431(b), and failed to ask the third group of potential jurors whether they understood the principle that defendant's failure to testify cannot be held against him. Defendant concedes that he did not properly preserve this issue for appeal by either objecting at trial or in a posttrial motion, but urges this court to excuse his procedural default and review his claim on the merits under the plain error doctrine.

Initially, we note that when interpreting a supreme court rule, our review is *de novo.* *People v. Suarez,* 224 Ill. 2d 37, 41-42 (2007). Under Rule 431(b), the trial court may question

---

[1] Rule 431(b) is a codification of our Supreme Court's holding in *People v. Zehr,* 103 Ill. 2d 472, 477 (1984). The *Zehr* principles make clear that; "essential to the qualification of jurors in a criminal case is that they know that a defendant is presumed innocent, that he is not required to offer any evidence in his own behalf, that he must be proved guilty beyond a reasonable doubt, and that his failure to testify in his own behalf cannot be held against him." *Id.*

potential jurors individually or as a group. Ill. S. Ct. R. 431(b) (eff. May 1, 2007). The trial court must allow each prospective juror the opportunity to respond when asked whether he or she understands and accepts the principles stated in Rule 431(b). *People v. Thompson,* 238 Ill. 2d 598, 607 (2010); see also *People v. Davis,* 405 Ill. App. 3d 585, 590 (2010) ("[a] trial court complies with Rule 431(b) when it admonishes the venire regarding the four *Zehr* principles and gives the venire an opportunity to disagree with them"). "Rule 431(b), therefore, mandates a specific question and response process." *Thompson,* 238 Ill. 2d at 607. Further the committee comments to Rule 431(b) warn that "trial courts may not simply give 'a broad statement of the applicable law followed by a general question concerning the juror's willingness to follow the law.' " *Id.* (quoting Ill. S. Ct. R. 431(b), Committee Comments (eff. May 1, 2007)).

A review of the record in this case shows the trial court failed to comply with the requirements of Rule 431(b). First, when addressing all three groups of potential jurors, the trial court combined the first three *Zehr* principles into one. For example, when addressing the first group of potential jurors, the trial court stated:

> "Do all of you know or understand that the defendant is
>
> presumed innoc[ent]of these charges and he do[es] not have to
>
> offer any evidence in his own behalf, but must be proven guilty
>
> beyond a reasonable doubt by the State? If you all know that or
>
> understand that principal of law, please raise your right hand."

The trial court addressed the other two groups of potential jurors using substantially the same language. This is not the "specific question and response process" that Rule 431(b) requires

23

but, rather, is more like the " 'broad statement of *** applicable law followed by a general question concerning the juror's willingness to follow the law' " that the committee comments warn against. *Id.*(quoting Ill. S. Ct. R. 431(b), Committee Comments (eff. May 1, 2007)). By combining the first three principles of Rule 431(b) into one broad principle, the trial court did not allow the potential jurors to acknowledge that they understood and accepted each of those principles.

The trial court further erred because although it asked the potential jurors whether they knew or understood the four principles of Rule 431(b), it never asked any of the potential jurors whether they "accepted" them. Ill. S. Ct. R. 431(b) (eff. May 1, 2007) ("The court shall ask each potential juror *** whether that juror understands and accepts" the principles of Rule 431(b).). In admonishing the first group of potential jurors, after combining the first three Rule 431(b) principles into one principle, the court stated, "If you all know that or understand that principle of law, please raise your hand." The trial court similarly admonished the other two groups of potential jurors substantially the same way. The trial court never asked the potential jurors whether they accepted the principles of Rule 431(b).

However, because defendant did not preserve this issue for appellate review, we may address the issue on its merits only if the defendant sustains his burden of persuasion on either of the two prongs of the plain error doctrine. Under the first prong of plain error analysis, defendant has failed to carry his burden of persuasion and prove prejudicial error. *People v. Herron,* 215 Ill. 2d 167, 187 (2005). The evidence in this case is not closely balanced. As support for his contention that the evidence was closely balanced on the issue of recklessness, defendant relies on

24

there being only one wound. The autopsy, however, revealed multiple wounds. Defendant's reckless behavior argument is also refuted by the disparity in size and strength between defendant and Nicole, and the use of a weapon. The evidence defendant relies on to support a finding that the evidence was closely balanced on the issue of recklessness is clearly outweighed by the evidence the State presented showing defendant did not act recklessly. Defendant has not shown that "the evidence was so closely balanced that the error alone severely threatened to tip the scales of justice against him." *Herron,* 215 Ill. 2d at 187.

Defendant has also failed to carry his burden of persuasion under the second prong of the plain error doctrine. Our supreme court recently held in *Thompson,* 238 Ill. 2d at 608, that a violation of Rule 431(b) does not automatically constitute a structural error subject to reversal. The supreme court reasoned that the purpose of Rule 431(b) admonishments is to insure a fair and impartial jury. *Id.* at 609. The court noted that "[a] finding that defendant was tried by a biased jury would certainly satisfy the second prong of plain-error review because it would affect his right to a fair trial and challenge the integrity of the judicial process." *Id.* at 614. However, the supreme court held it cannot be presumed that a jury was biased solely because of a trial judge's failure to properly admonish potential jurors under Rule 431(b). *Id.* In *Thompson,* the supreme court concluded the defendant had not carried his burden of persuasion under the second prong of plain error review because the defendant had not presented any evidence of a biased jury. *Id.*

In this case, like in *Thompson,* defendant has not carried his burden of persuasion because he failed to show the jury was biased in any way by the Rule 431(b) admonishment provided.

25

Although defendant argues he was denied a substantial right and, thus, denied a fair trial, he does not show how the jury was biased or unfair. He does not point to any evidence that the jury was biased. Under *Thompson,* defendant has failed to carry his burden of persuasion under the second prong of the plain error doctrine. Finding defendant has failed to establish either prong of plain error doctrine, we cannot excuse his procedural default and reach the merits of his claim.

Defendant's Sentence

Defendant next argues his aggregate sentence was excessive because in sentencing him as it did, the sentencing court failed to give adequate weight to defendant's background and rehabilitative potential. The State argues the sentencing court did not abuse its discretion in sentencing defendant because the court considered factors in both mitigation and aggravation. The State also points out that for first degree murder, defendant faced 20 to 60 years in prison and for concealment of a homicidal death, he faced 2 to 5 years to run consecutively to his murder conviction. Based on the maximum sentence defendant could have received, the State argues that sentencing defendant to 36 years for first degree murder and a consecutive prison term of 4 years for concealment of a homicidal death was not an abuse of discretion.

The Illinois Constitution requires that "[a]ll penalties shall be determined both according to the seriousness of the offense and with the objective of restoring the offender to useful citizenship." Ill. Const. 1970, art. I, §11. Accordingly, a trial court must balance the goals of retribution and rehabilitation of the defendant when determining a sentence. *People v. Quintana,* 332 Ill. App. 3d 96, 109 (2002). This determination must be based "on the particular circumstances of each case, considering such factors as the defendant's credibility, demeanor,

26

general moral character, mentality, social environment, habits, and age." *People v. Fern,* 189 Ill. 2d 48, 53 (1999). The trial court is not "required to make an express finding that defendant lacked rehabilitative potential." *Quintana,* 332 Ill. App. 3d at 109. Further, a defendant's potential for rehabilitation is not given greater weight than the seriousness of the crime. *People v. Coleman,* 166 Ill. 2d 247, 261 (1995).

Trial courts are given wide discretion in sentencing defendants. *People v. O'Neal,* 125 Ill. 2d 291, 297 (1988). The trial court is in the best position to weigh the evidence and to assess the credibility of the witnesses. *People v. Jones,* 168 Ill. 2d 367, 373 (1995). The trial court's discretion, however, "is not unfettered." *O'Neal,* 125 Ill. 2d at 297. Under Supreme Court Rule 615, a court of review has the power to reduce a defendant's sentence if the sentence was unlawful or an abuse of the trial court's discretion. Ill. S. Ct. R. 615(b)(1), (b)(4); *Jones,* 168 Ill. 2d. at 378. In reviewing a defendant's sentence, this court "must proceed with great caution and must not substitute its judgment for that of the trial court merely because it would have weighed the factors differently." *Fern,* 189 Ill. 2d at 53. If a sentence is within the statutory limits, a court of review will not alter that sentence unless the trial court abused its discretion. *People v. Coleman,* 166 Ill. 2d 247, 258 (1995). Further, "[a] sentence within statutory limits will not be deemed excessive unless it is greatly at variance with the spirit and purpose of the law or manifestly disproportionate to the nature of the offense." *Fern,* 189 Ill. 2d at 54.

In this case, defendant does not contest that his sentence was not within the statutory limits and our review of the record shows that the sentencing court did not abuse its discretion in sentencing defendant as it did. We find defendant's argument has no merit because the record

shows that the court considered both defendant's background and his potential for rehabilitation when determining the appropriate sentence. The sentencing judge specifically cited defendant's upbringing and his lack of an adult criminal record as factors in mitigation. However, the sentencing judge also acknowledged the severity of Nicole's injuries and the treatment of her body as factors in aggravation. See *Coleman*, 166 Ill. 2d at 261 (a defendant's potential for rehabilitation is not given greater weight than the seriousness of the crime.) Our review of the record shows, despite defendant's argument to the contrary, the sentencing judge did consider defendant's background and his potential for rehabilitation in determining a proper sentence. The trial court did not abuse its discretion in sentencing defendant.

Presentence Credit

Defendant's final argument is that the trial court erred in crediting defendant with only 1,937 days of presentencing credit for the time he remained in custody. Defendant argues that because he was arrested on January 8, 2004, and was sentenced on May 4, 2009, he is entitled to 1,944 days of presentencing credit, an additional 7 days. Defendant's calculation of 1,944 days of presentencing credit includes the date of his sentencing, May 4, 2009. The State concedes that the trial court improperly considered January 10, 2004, as the date of defendant's arrest instead of January 8, 2004. In its brief before this court, the State argued that defendant is entitled to 1,939 days of credit. The State's calculation includes January 8, 2004, as the date of defendant's arrest, but does not include the day of defendant's sentencing. At oral argument, the State acknowledged that its calculation in its brief was incorrect. The State concedes defendant's calculations were correct, but contends that the presentencing credit should not include the day of

sentencing and, therefore, the State maintains defendant is entitled to 1,943 days of presentencing credit.

We find, based on the parties agreed arrest date of January 8, 2004, defendant is entitled to 1,943 days of presentencing credit. This calculation does not include the day defendant was sentenced, May 4, 2009. See *People v. Williams*, 239 Ill. 2d 503, 504 (2011) ("date of the mittimus is the first day of sentence and a defendant should therefore not be credited with that day as presentencing credit by the circuit court). Therefore, defendant's mittimus is modified to reflect the amount of 1,943 days of presentencing credit.

CONCLUSION

For the foregoing reasons, the judgment of the circuit court of Cook County is affirmed and the mittimus is corrected.