THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. ANNETTE PRICE, Defendant-Appellant.

Second District No. 2—86—0146

Opinion filed July 31, 1987.

G. Joseph Weller, of State Appellate Defender's Office, of Elgin, for appellant.

Fred L. Foreman, State's Attorney, of Waukegan (William L. Browers and Lori J. Miller, both of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

JUSTICE UNVERZAGT delivered the opinion of the court:

A Lake County jury convicted the defendant, Annette Price, of murder (Ill. Rev. Stat. 1985, ch. 38, par. 9—1(a)) and armed violence (Ill. Rev. Stat. 1985, ch. 38, par. 33A—2) in connection with the death of Gabriel Perez, Jr. The jury found her not guilty of voluntary manslaughter. (Ill. Rev. Stat. 1985, ch. 38, par. 9—2(b).) Defendant received a 75-year extended prison term. She appeals, contending that: (1) she was not proved guilty beyond a reasonable doubt; (2) the evidence at best supports only a conviction for voluntary manslaughter; (3) the trial court erred in instructing the jury on an initial aggressor's use of force in self-defense; and (4) the trial court abused its discretion in imposing an extended prison term.

We will summarize only the facts relevant to defendant's contentions. The decedent's body was found in a field in Waukegan in the early morning hours of October 5, 1985, near the car he had borrowed from a friend the previous evening. He had been stabbed four times in the neck and bled to death as a result of one of those wounds, which pierced his carotid artery. He was intoxicated at the time of his death. Inside the car, which was still running, police found the defendant's shoes and purse, which contained her identification. They found a plastic bag containing cocaine on the car floor. Approximately two hours after decedent's body was discovered, police responded to defendant's complaint that she had been raped. She was taken to the

police station, where she made a statement to Waukegan police detective Lou Tessman.

Tessman testified at the trial that defendant gave him several accounts of the incident, first denying any knowledge of it and then claiming that the decedent had raped her. He typed up her final account, which she reviewed, made some corrections to, and signed. In that account the defendant stated that, on the previous evening, she and four companions had driven to Waukegan from Racine, Wisconsin, so that she and the two other women in the group could work as prostitutes there. One of the men with them was Milton Garrett, her pimp.

She was alone in a bar when she met the decedent. After they talked for some time, the decedent handed her a bag of cocaine and offered to pay her $25 and a line of cocaine to have sexual intercourse with him. She immediately returned the bag, stating that she did not take cocaine, and the two agreed instead on a price of $40. They left the bar, taking decedent's car, drove for approximately five minutes, and pulled over on a dark street. Decedent paid the defendant $40, and the two got into the backseat, where they engaged in intercourse, with defendant on top of decedent. After some time, defendant got off the decedent and began to return to the front seat. The decedent then told her that he loved her and that he wanted to have sex again; she complied. After they completed this act, the defendant returned to the front passenger seat and attempted to get dressed, but the decedent kept grabbing her hands so that she could not do so. He repeatedly told her that he loved her and that he wanted to have sex again. He straddled the center console, and put his hands on her shoulders. She asked him to take her back to the bar, but he continued telling her he loved her. She stated that he was not armed and was not hurting or threatening her, but would not let her go. She reached into her purse, which was on the floor in front of her, pulled out a knife which she kept for protection, and began swinging at him with it. She said she wanted to hurt him because she wanted to leave. When he began to bleed profusely, she grabbed her clothing and got out of the car. She attempted to grab her purse and shoes, but the decedent drove away quickly with the items still inside.

Defendant walked and ran to a nearby restaurant, dropping the knife in some grass on the way. She was able to get a ride back to the bar from two unidentified men. There she rejoined her companions in their car and told Garrett what had happened. She said she was hysterical at this point and that Garrett ripped her blouse to make it look as if she had been raped. The next thing she recalled was being es-

corted from the car by a police officer.

Defendant's testimony at trial was different. She stated that during the first act of intercourse with the decedent she got off him when she felt he had had enough for the money he had given her. He told her he was not finished and "snatched" her back to him by the shoulders and held her there. She testified that after they completed the second act of intercourse, and she had returned to the front seat, he began screaming at her, telling her he loved her, and that she was not "ever going anywhere." He told her he would not allow her to return to the bar or her friends. She became frightened and believed he really was not going to let her go. She stated he was grabbing and hugging her shoulders and shaking her. He had defendant pinned in the front seat with his upper body, and kept trying to kiss her, forcing her head back up against the window. She stated that he hit her four or five times with his fists. Defendant explained that the knife was already lying between the passenger's seat and the door, where she had placed it when she undressed before getting into the backseat. She tried to pull the decedent off her, but could not, and could barely move. She then picked up the knife, believing he would release her once he saw it. When he kept coming at her, she "poked" him with it. After she stabbed him, he moved to the driver's seat, and she was able to get out of the car.

She said she told the police she had been raped, because the decedent had sex with her more than the one time he had paid for, and because he had beaten her and told her she could not leave. She explained the discrepancies between her in-court testimony and the statement detective Tessman typed by stating that she only skimmed the statement before signing each page and did not realize it was inaccurate.

Shirley Buckley testified for the State. She came to know the defendant while both were in jail prior to defendant's trial. Buckley had been convicted of armed robbery and was awaiting sentencing. She and defendant talked about defendant's case, and defendant told Buckley that while she (defendant) was in the car with the decedent, she noticed a package of cocaine on the console. She kicked the package with her feet and continued making conversation. Because she had only kicked it, she said, the police would not find her fingerprints on it. When the decedent asked where it was, she did not tell him, or told him she did not know. On cross-examination Buckley said defendant told her that the mislaid cocaine started an argument between the two, and that the decedent told defendant that he would not permit her to leave until she gave it back to him. Buckley said defendant re-

counted "hesitating in her mind what she was going to do to him," and then stabbed him. Defendant had initially told Buckley she had been raped, but later said the decedent had not hit her. When Buckley pointed out that defendant could not use two different stories in court, Buckley said the defendant replied that "she would have it together by then."

Jessica Bailey, one of the women who accompanied defendant from Racine, testified that when she first saw defendant after the incident she heard defendant tell Garrett that the decedent "wouldn't let her go, so she had to stab him."

Milton Garrett testified for the defense. He said that when defendant returned to their car after the incident, she was crying uncontrollably. She told him that the decedent had tried to hurt her, "he wouldn't let her go, and he was hanging on her or banging on her." They drove around for some time, and he considered taking the group back to Wisconsin, but decided to go to the police instead. He said he tore the defendant's blouse without consulting her as a "psychological move" to make the others, who opposed approaching the police, more comfortable with the idea. He stated that the blouse had, in fact, already been torn and that he simply extended the tear.

Photographs of the defendant taken the morning of October 5, 1985, and introduced into evidence by the State, revealed no apparent bruises or other injuries to her. Defendant complained only of a cut on her finger and refused medical attention for it.

Defendant contends that the evidence does not support a murder conviction, as the prosecution has failed to prove beyond a reasonable doubt that the killing was not justified as self-defense. She contends that the jury improperly disregarded her account of the incident and that the evidence supports, at most, a conviction for voluntary manslaughter. We do not agree.

Once a defendant affirmatively raises the issue of self-defense, the State must prove, beyond a reasonable doubt, that the use of force was not justified. (See, *e.g., People v. Charleston* (1985), 132 Ill. App. 3d 769, 773; *People v. Estes* (1984), 127 Ill. App. 3d 642, 651.) The issue is always a question of fact for the jury to decide (*People v. Estes* (1984), 127 Ill. App. 3d 642, 651), and a reviewing court will not set aside its verdict unless "the State's evidence was so improbable, impossible or unsatisfactory as to raise a reasonable doubt of defendant's guilt." (*People v. Charleston* (1985), 132 Ill. App. 3d 769, 777.) "The trier of fact need not believe defendant's version even though it was the only one, and it may consider other facts and circumstances in the record which tend to contradict defendant's story

or at least raise serious questions about its probability [citations]."
(*People v. Liddell* (1975), 32 Ill. App. 3d 828, 830.) The State may discredit the defendant's account by producing evidence that she is lying. *People v. Foster* (1979), 76 Ill. 2d 365, 373.

In the instant case, defendant was alone with the decedent at the time of the killing, but her in-court testimony was not the only version of the incident presented to the jury. The defendant gave other accounts to Detective Tessman and Shirley Buckley, and those versions were also heard by the jury. The very fact that defendant gave conflicting accounts detracts from her credibility. (See *People v. McCoy* (1986), 140 Ill. App. 3d 868, 873; *People v. Lester* (1981), 102 Ill. App. 3d 761, 767.) She also fled the murder scene and disposed of the weapon, which facts are indicative of her consciousness of guilt. (See, *e.g.*, *People v. Cox* (1984), 121 Ill. App. 3d 118, 123.) And although she voluntarily went to the police two hours later, she did so only with a fabricated account of the incident and knowing that her identification was in the decedent's car.

Furthermore, the use of deadly force in self-defense is only justified where necessary to prevent imminent death or great bodily harm. (Ill. Rev. Stat. 1985, ch. 38, par. 7—1; see also *People v. Estes* (1984), 127 Ill. App. 3d 642, 649.) Yet defendant never told police that she feared the decedent would kill or seriously injure her, or that he threatened to do so. (See *People v. Bolden* (1985), 132 Ill. App. 3d 1047, 1058-59.) Rather, she stated that he did not threaten or hit her, but only that he would not let her go. This account is corroborated by the undisputed facts that the decedent was not armed (see *People v. Lester* (1981), 102 Ill. App. 3d 761, 767 (noting that whether the victim was armed is a probative factor in assessing a defendant's self-defense theory)), and defendant was not injured except for receiving a cut to one finger. The jury was not bound to accept defendant's subsequent self-serving claim that the decedent was beating her when she killed him. (See *People v. Bolden* (1985), 132 Ill. App. 3d 1047, 1059.) There was ample evidence to support the verdict, and we find no reasonable doubt of defendant's guilt.

Defendant argues that even if her fears were unreasonable, only a conviction for voluntary manslaughter (Ill. Rev. Stat. 1985, ch. 38, par. 9—2(b) (dealing with defendant's unreasonable belief that circumstances existed which justified her use of deadly force)) was appropriate. She asks this court to reduce the degree of her offense to voluntary manslaughter. It is the province of the jury to assess the credibility of witnesses and the weight to give their testimony. (See *People v. Denson* (1985), 139 Ill. App. 3d 914, 924.) A voluntary man-

slaughter (unreasonable belief) conviction is proper where the jury concludes that defendant *actually*, though unreasonably, believed that force was necessary to prevent imminent death or great bodily harm. (See *People v. Lockett* (1980), 82 Ill. 2d 546, 551-52.) However, if the jury concludes that she in fact had no such belief "the verdict should be murder." (82 Ill. 2d 546, 551; see also *People v. Denson* (1985), 139 Ill. App. 3d 914, 924.) The jury found defendant guilty of murder and not guilty of voluntary manslaughter—necessarily implying that they concluded she did not, even subjectively and unreasonably, believe that justifying circumstances existed. (*Cf. People v. Hoffer* (1985), 106 Ill. 2d 186, 195 (noting that jury instructions there allowed a murder verdict only if the jury concluded defendant did not believe justifying circumstances existed).) There is considerable evidence in the record supporting the jury's verdict, and this court therefore will not reduce the degree of the offense. See *People v. Denson* (1985), 139 Ill. App. 3d 914, 924.

 █ Defendant next contends that there was no evidence in the record to support the trial court's instruction to the jury on the use of force in self-defense by one who is the initial aggressor. The court submitted the following instruction, the first portion of Illinois Pattern Jury Instructions, Criminal, No. 24—25.09 (2d ed. 1981) (IPI Criminal 2d), to the jury over defendant's objection:

"A person who initially provokes the use of force against herself is justified in the use of force only if the force used against her is so great that she reasonably believes she is in imminent danger of great bodily harm, and she has exhausted every reasonable means to escape the danger other than the use of force which is likely to cause death or great bodily harm to the other person."

The parties apparently agree that the instruction was directed to Shirley Buckley's testimony that defendant told her that she (defendant) kicked a bag of cocaine off the car console and then refused to tell the decedent where it was, causing an argument.

Defendant argues that the evidence only established that she wanted to keep her fingerprints off the bag to avoid being implicated in decedent's criminal conduct. She claims the conduct was neither unlawful nor improper and therefore could not constitute provocation sufficient to make her the initial aggressor. Contrary to defendant's assertions, however, Buckley did not testify as to defendant's reasons for kicking the package. And though the evidence may have been slight, the jury could alternatively have inferred from it that defendant was preparing to steal the cocaine. Even very slight evidence on a

particular theory will support a jury instruction based on it. (*People v. Kalpak* (1957), 10 Ill. 2d 411, 425; *People v. Rice* (1982), 108 Ill. App. 3d 344, 353.) And where, as here, the jury was also given a standard self-defense instruction (IPI Criminal 2d No. 24-25.06), use of the disputed instruction did not erroneously imply that defendant was in fact the initial aggressor; rather, the jury was permitted to resolve the matter under either theory. (See *People v. Townsend* (1985), 136 Ill. App. 3d 385, 392; *People v. Ellis* (1982), 107 Ill. App. 3d 603, 614.) We find no error.

We must agree, however, with defendant's final contention that the trial court erred in imposing a 75-year sentence. The extended-term statute permits a sentencing judge to impose an extended term where it finds defendant's conduct was "accompanied by exceptionally brutal or heinous behavior indicative of wanton cruelty." (Ill. Rev. Stat. 1985, ch. 38, par. 1005—5—3.2(b)(2).) The court found defendant's conduct to be of that nature, noting that she repeatedly stabbed the decedent "[w]hile making love." While we recognize that a trial court's sentencing decision should not be disturbed in the absence of an abuse of discretion (*People v. Perruquet* (1977), 68 Ill. 2d 149), the extended-term statute "was not intended to convert every offense into an extraordinary offense subject to an extended-term sentence" (*People v. Evans* (1981), 87 Ill. 2d 77, 88-89). "Heinous" conduct has been described as that which is " 'hatefully or shockingly evil: grossly bad: enormously and flagrantly criminal.' " (*People v. La Pointe* (1981), 88 Ill. 2d 482, 501; *People v. Nester* (1984), 123 Ill. App. 3d 501, 504), while "brutal" conduct is " 'grossly ruthless,' 'devoid of mercy or compassion: cruel and cold-blooded' " (*People v. La Pointe* (1981), 88 Ill. 2d 482, 501; *People v. Nester* (1984), 123 Ill. App. 3d 501, 504). There is no requirement, to warrant the imposition of an extended-term sentence, that defendant's conduct included torturing her victim or inflicting unnecessary pain on him. (*People v. La Pointe* (1981), 88 Ill. App. 3d 482, 501; *People v. Nester* (1984), 123 Ill. App. 3d 501, 504.) However, her conduct must have been *exceptionally* brutal or heinous. 123 Ill. App. 3d 501, 504.

Defendant's conduct in the instant case was undeniably reprehensible and resulted in a senseless and unnecessary death. Moreover, there was evidence that she placed the knife where it would be readily available well in advance of the murder, and that she deliberated, at least momentarily, before stabbing her unarmed customer four times. However, she reacted with shock and panic when she realized she had seriously injured him. She jumped out of the car, leaving her purse and shoes behind. (*Cf. People v. Thomas* (1985), 139 Ill.

App. 3d 163, 186 (finding an extended term unwarranted where the murderers were so shaken by their own actions that they could not complete the robbery).) While the prosecution placed great emphasis on the fact that defendant stabbed a man who was telling her he loved her, he was apparently doing so while detaining her against her will. This is an unusual case in that all of the occurrence evidence came directly or indirectly from the defendant. While she gave wildly varying accounts to the police, to Buckley, and, finally, to the jury, all of the accounts are consistent on one point, which we see no reason to discredit—the decedent, for whatever reason, would not let the defendant go. We simply cannot conclude that the defendant's conduct was so exceptionally heinous or brutal as to warrant an extended-term sentence. (See *People v. Kane* (1986), 140 Ill. App. 3d 928, 931 (and the cases described therein).) We additionally note that defendant was only 20 years old at the time of the murder, and that she expressed regret before sentencing. (Compare *People v. La Pointe* (1981), 88 Ill. 2d 482, and *People v. Nester* (1984), 123 Ill. App. 3d 501 (in which the defendants showed a complete lack of remorse) with *People v. Kane* (1986), 140 Ill. App. 3d 928 (in which the 17-year-old defendant read a letter of regret he had written before sentencing).) We believe that, under the unique circumstances presented here, the trial court's imposition of an extended-term sentence was erroneous. We therefore conclude that defendant's sentence must be reduced to 40 years, the maximum (nonextended term) sentence for murder. Ill. Rev. Stat. 1985, ch. 38, par. 1005—8—1(a)(1); see *People v. Kane* (1986), 140 Ill. App. 3d 928, 931; *People v. Thomas* (1985), 139 Ill. App. 3d 163, 186.

The judgment of the trial court is affirmed as modified.

Affirmed as modified.

WOODWARD and REINHARD, JJ., concur.