# Illinois Official Reports

## Appellate Court

---

**People v. Beasley, 2014 IL App (4th) 120774**

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. ALVIN C. BEASLEY, Defendant-Appellant. |
| District & No. | Fourth District<br>Docket No. 4-12-0774 |
| Filed | April 25, 2014 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | In an action arising from a fatal shooting following an altercation at a party, defendant's conviction for second degree murder was reversed on the ground that the trial court abused its discretion in failing to instruct the jury on involuntary manslaughter, since the evidence presented could have led a rational jury to conclude that defendant acted recklessly and did not intend to shoot the victim. |
| Decision Under Review | Appeal from the Circuit Court of Vermilion County, No. 11-CF-749; the Hon. Michael D. Clary, Judge, presiding. |
| Judgment | Reversed. |

Counsel on
Appeal

Michael J. Pelletier, Jacqueline L. Bullard, and Daaron V. Kimmel (argued), all of State Appellate Defender's Office, of Springfield, for appellant.

Randall Brinegar, State's Attorney, of Danville (Patrick Delfino, David J. Robinson, and Luke McNeill (argued), all of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

Panel

JUSTICE KNECHT delivered the judgment of the court, with opinion.
Presiding Justice Appleton and Justice Pope concurred in the judgment and opinion.

**OPINION**

¶ 1    Defendant, Alvin C. Beasley, appeals from a jury verdict of guilty of second degree murder. Defendant argues the trial court abused its discretion in failing to instruct the jury on involuntary manslaughter where some evidence supported that theory. We reverse.

¶ 2                          I. BACKGROUND

¶ 3    On December 23, 2011, the State charged defendant with three counts of first degree murder. Count I alleged on December 23, 2011, defendant, without lawful justification and with the intent to kill, performed the acts which caused the death of Deryon S. Mullins (720 ILCS 5/9-1(a)(1) (West 2010)). Count II alleged on December 23, 2011, defendant, without lawful justification and with the intent to do great bodily harm, performed the acts which caused the death of Deryon S. Mullins (720 ILCS 5/9-1(a)(1) (West 2010)). Count III alleged on December 23, 2011, defendant, without lawful justification and knowing his acts created a strong probability of death or great bodily harm, performed the acts which caused the death of Deryon S. Mullins (720 ILCS 5/9-1(a)(2) (West 2010)).

¶ 4    Defendant's trial began on June 25, 2012. Several witnesses testified to the events occurring on December 23, 2011, the night of the shooting. A party was held at the Mullins home on Quincy Street in Danville, Illinois. The attendees were mostly teenagers. When Janet Mullins and her daughter, Monica Mullins McCoy, returned home, Monica kicked the partygoers out of their house. They began to mill around outside the house and in the street. Les Fisher and Natalie Brandon lived across the street from the Mullins house and on the corner of Outten Street. Fisher and Brandon were out for the evening, and when they returned, they found their house had been broken into. Fisher accused the young people congregated in the street of taking his television sets and PlayStation, Xbox, and Wii game machines.

¶ 5    The young people vehemently denied breaking into Fisher's home and taking his property. The parties screamed and yelled at each other. Fisher eventually called his brother, defendant, for some help. Defendant was riding around with his cousin and arrived at Fisher's house in a few minutes. When they arrived, defendant took a pistol from his cousin to defend himself

- 2 -

after he observed a crowd of 20 to 30 people angrily yelling back and forth with Fisher about the break-in. Defendant got out of the car and went over to Fisher and asked him what was going on. He heard someone yell a threat from behind him and turned around to find five to six people, including Deryon Mullins, approaching and making aggressive gestures and verbal threats. Defendant raised the pistol and waved it in their general direction without pointing it at anyone in particular and told them not to move.

¶ 6   Deryon continued moving toward defendant and began pulling on gloves that defendant identified as having a "good grip" and "being kinda cocky and arrogant" about it. Defendant again told the group not to move but Deryon made a sudden, unexpected movement with his hands down toward his waistband and the gun defendant was holding "accidentally" went off, firing once.

¶ 7   Defendant testified he did not intentionally fire the gun, and he did not intentionally point or aim it at Deryon or anyone else in particular. When asked how the gun could have just gone off, defendant hypothesized it must have been a "reaction" caused in part by his elevated fear of attack from past violent encounters in which people had shot at him. Defendant did not see whether Deryon began to turn away at the last second. After the gun went off, Deryon shouted he had been hit, ran into the Mullins house, collapsed on the floor, and died of his injuries. Defendant "panicked" and fled the scene. No other shots were fired.

¶ 8   Other witnesses at the party with Deryon testified defendant stated "don't move" twice before the gun went off. The witnesses could not agree on what Deryon was doing when the gun went off. One testified Deryon was "walking slowly" in a perpendicular direction to defendant when the gun went off. Another said Deryon was running quickly, not walking. A third witness stated Deryon did not go toward defendant at all but ran away and defendant shot him in the back. A fourth witness stated just before the shot, Deryon both "turned around and was fitting [*sic*] to start running" and was also "[j]ust standing in the middle of the street *** just standing there."

¶ 9   Most of the witnesses agreed it did not look like defendant was pointing the gun at anyone in particular before it went off. No one testified defendant specifically aimed the gun at Deryon.

¶ 10   Monica McCoy testified she did not "see who did it" and did not see defendant with a gun but eventually admitted she told the police "it did not look like [defendant] was pointing the gun at any specific person." She also stated she only saw the gun at the moment it went off and at the time she "thought he shot a warning shot" and thought defendant "didn't even realize he hit Deryon."

¶ 11   Dr. John Denton, forensic pathologist, described his examination of Deryon's body, noting the bullet entered the upper right part of the back and exited the upper left part of the chest, travelling diagonally through the body going both "back to front" and "right to left."

¶ 12   Defense counsel objected to a proposed jury instruction on first degree murder, asking the trial court to also instruct the jury on the lesser-included offenses of second degree murder and involuntary manslaughter because some evidence supported each of those theories. The court granted the instruction on second degree murder but denied the instruction on involuntary manslaughter. The jury then acquitted defendant on the charge of first degree murder but found him guilty of second degree murder. This appeal followed.

## II. ANALYSIS

Giving jury instructions is a matter within the sound discretion of the trial court. *People v. Jackson*, 372 Ill. App. 3d 605, 613, 874 N.E.2d 123, 130 (2007). "A defendant is entitled to a lesser-included offense instruction only if the evidence at trial is such that a jury could rationally find the defendant guilty of the lesser offense, yet acquit him of the greater." *People v. Medina*, 221 Ill. 2d 394, 405, 851 N.E.2d 1220, 1226 (2006).

A case from our district states an instruction on a lesser offense is justified when there is some credible evidence to support the giving of the instruction. *Jackson*, 372 Ill. App. 3d at 613, 874 N.E.2d at 130.

We believe the contrast in language in *Medina* and *Jackson* could cause confusion. The continued use of the "some credible evidence" language could lead a trial judge to believe it is permissible to weigh the credibility of the defendant and the evidence presented in deciding whether to give an instruction on a lesser offense.

We recognize the "some credible evidence" language has been used in other cases from the appellate courts and the Supreme Court of Illinois. See *People v. Jones*, 219 Ill. 2d 1, 31, 845 N.E.2d 598, 614 (2006). We believe it is preferable to rely on the language from *Medina*.

The basic difference between involuntary manslaughter and first degree murder is the mental state accompanying the conduct resulting in the victim's death. *Jackson*, 372 Ill. App. 3d at 613, 874 N.E.2d at 130. "For first degree murder, the defendant knows his acts 'create a strong probability of death or great bodily harm.' " *Id.* (quoting 720 ILCS 5/9-1(a)(2) (West 2000)). For "involuntary manslaughter, the defendant performs acts 'likely to cause death or great bodily harm' and he performs those acts 'recklessly.' " *Id.* (quoting 720 ILCS 5/9-3(a) (West 2000)).

A defendant's testimony alone he did not intend to shoot anyone does not provide a sufficient basis for instructing on involuntary manslaughter. *Jackson*, 372 Ill. App. 3d at 614, 874 N.E.2d at 130. Defendant argues his testimony shows he did not intend to fire the gun but the gun just "went off" and this was enough to warrant the giving of an involuntary manslaughter instruction.

Defendant's testimony also showed he took the gun from the car and joined his brother "to defend his family." Defendant stated he told a group of five or six people "don't move" and then pointed the gun generally toward them. Defendant stated the victim kept advancing after two commands not to move from defendant and Deryon was putting gloves on. This apparently made defendant believe Deryon was about to do something or grab something he did not want his fingerprints on. Defendant stated Deryon suddenly moved toward his waistband, resulting in his gun "going off."

Defendant's testimony does show a person who may have shot another for reasons, correctly perceived or not, of self-defense. The person defendant shot was the one who made a sudden move directly before defendant shot him. He was the same person defendant observed putting gloves on and the only one ignoring defendant's commands not to move. By defendant's own admission, he had the gun pointed at the group with his finger on the trigger.

The trial court allowed defendant to argue self-defense and second degree murder in the belief, even if mistaken, Deryon had a gun and was going to shoot defendant. Defendant argues he just "flinched" or "reacted" when the gun went off. Defendant's "reaction" was a reaction to

- 4 -

Deryon's ignoring his commands not to move, putting on gloves and making a sudden movement toward his waistband. Defendant admitted he thought Deryon was acting aggressively and he felt threatened. Defendant shot the one person who was threatening him directly after he made a sudden movement. The jury concluded defendant shot in what he believed to be self-defense. The question is whether the evidence as a whole also warranted an involuntary manslaughter instruction.

¶ 23 Defendant argues the testimony of McCoy supported an involuntary manslaughter instruction when she stated it "did not look like [defendant] was pointing the gun at any specific person." McCoy also noted defendant's family and the victim's family knew each other and she assumed defendant would not take the drastic step of shooting Deryon, but he did. She stated, "I would have thought [defendant] shot in the air, but he shot my cousin." McCoy's testimony arguably provided some support for the proposition defendant did not intend to fire the gun at Deryon.

¶ 24 Defendant argues multiple witnesses agreed it did not look like he was pointing the gun at anyone in particular before it went off. Natoshia King testified defendant had the gun down and was not pointing it at anyone in the minutes leading up to the shooting prior to his statement, "Don't move." Andrew Pittman testified defendant was not pointing the gun at anyone in particular until Deryon took off running. Then defendant shot him. Mica Meakens testified defendant did point the gun at the group after he asked the second time where the stolen goods were. The witnesses provided some support for defendant's theory he did not intend to shoot Deryon.

¶ 25 The evidence arguably shows defendant was in a dispute with Deryon and thought he was advancing and making sudden moves to harm him. Defendant pointed his gun at the group Deryon was in moments prior to the shooting and he shot Deryon in the back. Yet, defendant's testimony suggests the gun went off accidentally, or was a "reaction" to his elevated sense of fear. Some testimony of the other witnesses supports defendant's position. The evidence supporting an involuntary manslaughter instruction is not as strong as the evidence supporting a second degree murder instruction, but the jury could rationally accept defendant acted recklessly and did not intend to shoot Deryon based on the evidence presented. Weighing the credibility of defendant and the other witnesses is a task for the jury, not the trial judge. The trial court's failure to instruct the jury on involuntary manslaughter was an abuse of discretion.

¶ 26                                        III. CONCLUSION
¶ 27        We reverse the judgment of the trial court.

¶ 28        Reversed.