NOTICE
This Order was filed under
Supreme Court Rule 23 and is
not precedent except in the
limited circumstances allowed
under Rule 23(e)(1).

2021 IL App (4th) 190486-U

NO. 4-19-0486

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
March 3, 2021
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
|     Plaintiff-Appellee, | ) | Circuit Court of |
|     v. | ) | Champaign County |
| CORNELIUS FREEMAN, | ) | No. 18CF285 |
|     Defendant-Appellant. | ) | |
| | ) | Honorable |
| | ) | Thomas J. Difanis, |
| | ) | Judge Presiding. |

JUSTICE TURNER delivered the judgment of the court.
Presiding Justice Knecht and Justice Holder White concurred in the judgment.

**ORDER**

¶ 1   *Held*:   The State's evidence was sufficient to prove beyond a reasonable doubt defendant did not act in self-defense, the circuit court did not err by denying defendant's request for an involuntary manslaughter instruction, and the court complied with Illinois Supreme Court Rule 431(b) (eff. July 1, 2012).

¶ 2        In March 2018, the State charged defendant, Cornelius Freeman, by information with one count of intentional first degree murder (720 ILCS 5/9-1(a)(1) (West Supp. 2017)) for the death of Michael White. In July 2018, the State charged defendant with two additional counts of intentional first degree murder and one count of knowing first degree murder (720 ILCS 5/9-1(a)(2) (West Supp. 2017)) for White's death. Before trial, the State dismissed the knowing murder count. At his March 2019 trial, defendant requested jury instructions on second degree murder, involuntary manslaughter, and self-defense. The Champaign County circuit court refused to give the instructions on involuntary manslaughter, but the other instructions

were given. The jury found defendant guilty of second degree murder. Defendant filed a motion for judgment notwithstanding the verdict or, in the alternative, a new trial. At a joint May 2019 hearing, the court denied defendant's posttrial motion and sentenced defendant to 20 years' imprisonment for second degree murder. Defendant filed a motion to reconsider his sentence, which the court granted on the issue of sentencing credit but denied the motion in all other respects.

¶ 3        Defendant appeals, contending (1) the State failed to prove beyond a reasonable doubt defendant did not act in self-defense when he shot White, (2) the circuit court erred by refusing defendant's request to give involuntary manslaughter instructions, and (3) the court failed to comply with Illinois Supreme Court Rule 431(b) (eff. July 1, 2012) during *voir dire*. We affirm.

¶ 4                                    I. BACKGROUND

¶ 5        In March 2018, defendant lived with his fiancée, Tomesia Lacy, and her son, Damarius Price. Their household had three vehicles, one of which was a black Dodge Caliber. Defendant was friends with White's girlfriend, Talonnie Bailey. Defendant had also sold marijuana to White and had given White a $250 loan unrelated to marijuana. White and Bailey lived at 1302 Sunset Drive in Champaign, Illinois.

¶ 6        On March 7, 2018, defendant drove the Dodge Caliber to White and Bailey's home to collect payment of the loan from White and to give Bailey a ride. Defendant parked his vehicle across the street from White and Bailey's home. White crossed the street and walked up to the passenger side front window of defendant's car. An encounter occurred between the two, and defendant shot White in the right, anterior shoulder. After he fired the shot, defendant exited his car and went around to the back of the car. Defendant observed White crouching or on his

- 2 -

knees, and defendant fired another shot in White's direction. The second shot missed White. After firing the second shot, defendant got back in his car and fled the scene. White died from the single gunshot to his shoulder. Defendant left the Champaign area and eluded police for several months. The State initially charged defendant with one count of intentional first degree murder. After he was captured, the State added two more counts of intentional first degree murder and one count of knowing first degree murder, which was later dismissed.

¶ 7        In March 2019, the circuit court held defendant's jury trial on the three counts of intentional first degree murder. In selecting the jury, the circuit court stated all four Rule 431(b) principles to potential jurors in groups of four. The court then asked whether the four understood the instructions. After each answered in the affirmative, the court asked whether the four accepted the instructions, and each answered in the affirmative. The court repeated the process for each group of four potential jurors.

¶ 8        In its case, the State presented the testimony of the following individuals: (1) Champaign police officer Daniel Ward; (2) Champaign police officer Russell Beck; (3) Lyndsey White, passerby; (4) Bailey; (5) Dr. Shiping Bao, forensic pathologist; (6) Champaign police lieutenant Matthew Henson; (7) Champaign police officer Christopher Aikman, (8) Lacy; (9) Price; (10) Champaign detective Robert DeLong; (11) Champaign sergeant Benjamin Newell; (12) Champaign detective Chad Shipley; (13) Champaign police officer Stephen Vogel; (14) Champaign detective Jody Cherry; (15) Champaign detective Patrick Simons; and (16) Champaign detective Patrick Funkhouser. The State also presented numerous exhibits, including a surveillance video and recording of a telephone conversation. Defendant testified on his own behalf and presented photographs of Lacy's living room and White's toxicology report. The parties submitted five stipulations, one of which was White had a 2009

conviction for home invasion. The trial evidence relevant to the issues on appeal is set forth below.

¶ 9        Officer Ward testified that, around 12:27 p.m. on March 7, 2018, he received a report from the dispatcher advising him a person had reported hearing two shots fired and saw a man lying on a sidewalk. Officer Ward was the first officer on the scene on Sunset Drive. Officer Ward estimated it took him about four minutes to respond to the report. When he arrived, Officer Ward observed a gentleman lying on the curb in front of 1301 Sunset Drive. Over defendant's objection, the State published still shots from Officer Ward's body camera showing the position of the victim's body on the curb (State's exhibit Nos. 3-A and 3-B). The time of the first still shot was 12:31 p.m. When he arrived on the scene, Officer Ward did not see any other individuals in the vicinity of the victim's body. Since Officer Ward did not immediately observe any blood on the victim, he believed the victim overdosed and began looking through the victim's pockets with the help of another officer who had later arrived. The officers removed two plastic bags from the man's pants pockets, one containing a white substance and the other a darker substance. Both substances were believed to be drugs. In his pants pockets, the officers also found numerous one-by-one inch plastic Baggies, a $100 bill, smaller denominations of bills, and a cellular telephone. Sergeant Funkhouser testified the total amount of money found in White's pockets was $280. Additionally, Officer Ward testified he found a 9-millimeter casing on the curb.

¶ 10       Officer Beck, a crime scene technician, testified he got called to the scene at 1301 Sunset Drive at 12:39 p.m. In processing the scene, he found a defect in the ground. Officer Beck later recovered a projectile from the hole in the ground. On March 12, 2018, Officer Beck processed the Dodge Caliber. He took several photographs of the exterior and interior of the

Dodge Caliber, which were admitted into evidence (State's Group exhibit No. 12). During her testimony, Lacy, defendant's fiancée, identified the vehicle in the photographs as hers. Officer Beck also testified he noticed the dirt on the Dodge Caliber was "pretty uniform" except for the front passenger door. There, it appeared somebody had leaned against the door or had swiped along the door.

¶ 11         Bailey testified that, on March 7, 2018, White had been living with her and her son for four months. One of White's nicknames was Moncler. Bailey and White were in a romantic relationship. Bailey had known defendant about a year, and they were "very close" friends but not romantic. Defendant's nickname was Gino, and Bailey saw defendant four to five times a week. They texted each other frequently. Bailey testified the State's exhibit No. 13A truly and accurately depicted her conversations with defendant via text. Bailey admitted she deleted many text messages from defendant to keep White from seeing them. She denied deleting any messages after White was shot. As friends, defendant drove Bailey on her errands and took her other places because she did not own a car. White also did not own a car. Before March 7, 2018, she had seen defendant on March 4, 2018, and defendant mentioned White was unresponsive about a debt he owed defendant. Bailey knew both White and defendant to carry a gun. In March 2018, she owned two guns but did not physically possess them. Bailey denied White used her firearms.

¶ 12         On March 7, 2018, Bailey sent defendant a text around 9:20 a.m. asking for a ride to Enterprise Rent-A-Car because she needed a car to pick up her son in Streamwood, Illinois. Bailey offered to send White away from the home when defendant picked her up. Bailey explained she was trying to get defendant to pick her up without fearing White would hurt him. Before defendant picked her up, he texted, "I'll pull up at your crib now. You ready? I'm

- 5 -

around the corner, and where is your pistol?" Bailey replied, "Brother got it, and yes." Bailey testified her aforementioned response to defendant's question about the pistol was a lie and she deleted it. Defendant took Bailey to Enterprise Rent-A-Car and dropped her off. Bailey's rental car was not ready, and she walked back to her home. Bailey later explained to defendant her rental car was not ready.

¶ 13 Bailey further testified defendant and White had a telephone conversation later in the morning on March 7. Bailey could only hear White's end of the conversation. Also, in the late morning, Bailey called defendant and asked him to remain calm. She explained White and defendant had "a very small dispute between" them. As shown on State's exhibit No. 13A and confirmed by Bailey during her testimony, the following text exchange took place between Bailey and defendant between 12:02 p.m. and 12:10 p.m.:

> Bailey: "I'll [let you know]. I'm out safe though G. Thank you"
>
> Defendant: "Just text fam and ask if he had anything for me"
>
> Bailey: "Who Moncler?"
>
> Bailey: "???"
>
> Defendant: "Stop it you know who I'm talking bout"
>
> Bailey: "Had to make sure."
>
> Defendant: "Right"
>
> Defendant: "No response"
>
> Defendant: "He just said yeah"
>
> Bailey: "That's what he just said"

¶ 14 After the text messages, Bailey and White got into an argument, and White walked out the door to cool off. White did not have a gun when he went outside. Bailey

remained inside and sat on her kitchen counter. Bailey heard a boom, which she later learned was a gunshot. When Bailey looked out her front door, she saw defendant at the back of the car on the passenger side. Defendant came back around to get in the driver's side of the car, and she saw defendant had a firearm in his hand. Bailey did not see anybody else near the vehicle and could not see White. After the car screeched off, she looked out a window and saw White on the ground and not moving. Around 30 seconds to a minute later, Bailey spoke with defendant on the telephone. Defendant told Bailey it was not supposed to happen like that. He asked if White was dead and if she was okay. Defendant told Bailey not to tell on him, and Bailey did not call the police.

¶ 15         Dr. Bao testified he performed an autopsy on White on March 8, 2018. White had a gunshot wound to the right anterior shoulder. The wound was an entrance wound about one-quarter inch in diameter. The "bullet went downwards from right to left and front to back." The bullet perforated White's right lung and his spinal cord at the T4 level. The perforation of the right lung caused the lung to collapse, which led to White's immediate death. Additionally, Dr. Bao testified the postmortem blood toxicology showed White had marijuana in his system. In his autopsy report (State's exhibit No. 35), Dr. Bao noted the skin did not have any evidence of close-range firing.

¶ 16         Detective Shipley testified he participated in the execution of a search warrant for defendant and Lacy's residence. He was responsible for the collection of evidence. Detective Shipley testified he collected State's exhibit No. 22 from the home. Based on his training and experience, he opined the exhibit was a drug ledger. Detective Shipley explained the ledger was found near 15 individually packaged bags of marijuana and two smoking devices. The ledger contained a list of names or nicknames with a dollar sign and then numbers written near each

name.  In the ledger was a notation stating "Moncler" and "$225."

¶ 17          Detective Simons testified he collected surveillance video from a home on Louisiana Street near the shooting.  The home had four cameras, one of which faced northwest towards the intersection of Sunset Drive and Bloomington Road.  The time on the video was 51 minutes behind the actual time.  The State played around 80 seconds of the surveillance video.  The video shows a black car pull up and stop in front of 1301 Sunset Drive.  A person wearing a dark top exited the home across the street, walked in front of the black car, and disappeared on the passenger side of the car.  While the video does not contain audio, nearby birds abruptly fly away at the same time, which suggests a loud noise like a gun shot.  After that, a person wearing a white shirt exited from the driver's door of the black car and moved to the rear of the car.  The person in the white shirt then returned to the driver's side door, got back into the black car, and drove away.  Additionally, Detective Simmons testified about data extraction from White's cellular telephone.  An extraction report for White's cellular telephone shows a text message from defendant at 12:01 p.m. stating, "What's the word you got anything for me G?"  At 12:07 p.m., White sent a text message stating, "Yup I finna hit your line."  The report also shows a call from White to defendant at 12:11 p.m. on March 7, 2018.  The call lasted two minutes.  Testimony was also presented defendant sent a text message to Lacy at 12:31 p.m., which stated "911."

¶ 18          Detective Funkhouser testified defendant was apprehended on July 16, 2018, in Mayfield, Kentucky.  Defendant was held in the Graves County jail in Kentucky for about 10 days.  Detective Funkhouser testified he received a recording of jail calls made by defendant in the Graves County jail.  A portion of one of the calls was played for the jury.  On the recording, defendant told another man he needed the man to talk to Bailey and tell her that, if she said

something messed up, she needed to correct it and tell the truth. Defendant pointed out that, if Bailey had told the truth like she claimed, then the police would not be looking for him. Defendant also suggested it was Bailey and her brother who were to blame because the weapon was in Bailey's name.

¶ 19 Defendant testified on his own behalf. He admitted he had a 2004 conviction for home invasion. Defendant also acknowledged he both used and sold cannabis on occasion in 2018. Moreover, defendant testified he always kept his Glock 17 pistol, which did not have a safety, with him for protection. Regarding White, defendant testified he met White through Bailey and described his relationship with him as an acquaintance. Defendant had seen White carry a firearm on several occasions. The last time was a few weeks before March 7. At that time, defendant was in White's home, and defendant observed a pinkish handled pistol in White's left pants pocket. Defendant knew the firearm because it belonged to Bailey. He also testified the debt that White owed him was unrelated to marijuana. Defendant was just helping White out with the loan.

¶ 20 On the morning of March 7, 2018, defendant was a little afraid of White based on conversations he had with Bailey. Defendant was trying to evade White. He took Bailey's response to his question about the location of her pistol as an indication White had her pistol. Defendant acknowledged Bailey had a biological brother. Defendant did not see White when he picked up Bailey and took her to the rental car place.

¶ 21 A little after noon, Bailey asked defendant if he could give her a ride after he came to pick up his money. Defendant assumed Bailey needed to go back to Enterprise Rent-A-Car. Defendant had exchanged text messages with White and believed White was going to pay him the money White owed defendant. Defendant and White did not have an argument over the

money. Defendant spoke on the telephone with Bailey after talking with White and could hear arguing in the background. He assumed the voice in the background was White's.

¶ 22    Defendant drove over to Bailey and White's house in the Dodge Caliber and parked across the street from the home. The Dodge Caliber had both automatic windows and door locks. Defendant had his firearm between his seat and the center console. Defendant turned the car off and left the keys in the ignition. Both the driver's window and the front passenger's window were down, and the car doors were locked. While he waited on White and Bailey, defendant looked at his cellular telephone. Defendant first saw White as White stepped off the curb and into the street. White was muttering and appeared mad. Based on his past experiences with White, defendant believed White was left-handed.

¶ 23    According to defendant, White walked in front of his vehicle and up to the passenger side window. White asked defendant, "The fuck is you steady textin my bitch fo?" White was angry. Defendant replied he did not know what was going on between White and Bailey and was just there to give Bailey a ride and get the money White owed him. White continued to cuss at defendant. Defendant could not understand why White was so mad. Defendant felt threatened when White reached his right hand inside the car to try to open the latch to get the car door open from the inside of the Dodge Caliber. White was unsuccessful in opening the door. Defendant asked White what he was doing, and then defendant grabbed his firearm. At that point, the barrel of the gun was pointing at the steering wheel. White reached into defendant's car a second time, and defendant hit the lock button to make sure the car doors were locked. Defendant did not want White coming into his car. He did not consider fleeing in the car because the car was turned off.

¶ 24    As defendant hit the lock button a second time, he saw White "launch" at him in

his peripheral vision. Defendant could not see White's left hand. Defendant reacted by firing the firearm towards the passenger window. He denied carefully aiming the gun. Defendant did admit he picked up the gun, pointed it, and fired it. When White lunged at him, defendant had no doubt in his mind they were going to get into a gun fight. After defendant fired his gun, he felt like he had to get out of the car. Defendant had not seen if he hit White. Defendant exited his car and walked to the back of the car, using the car as a shield. Defendant saw White on his knees or just crouched down. Defendant then fired a second shot and again did not carefully aim the gun. He described his second shot as a jerk reaction from seeing White and anticipating White was armed. Defendant saw the second shot go into the ground. When he did not see any immediate movement from White, defendant ran back and got into his vehicle. Defendant then drove away from the scene and went home. One of the shell casings landed in the vehicle, and defendant removed the casing from the car. He did talk to Bailey on the telephone after the shooting but could not recall who initiated the call. Defendant texted Lacy "911" because he was panicking. Defendant testified he never intended to kill White and did not set out to do White any harm. Most of the time, defendant tried to avoid having contact with White.

¶ 25        At some point in the afternoon of March 7, 2018, defendant left his home and went to Danville, Illinois. Defendant also turned his cellular telephone off. In Danville, defendant learned White had died, and he cried. He also disposed of his gun, the shell casing, and his cellular telephone in the river in Danville. Defendant then drove to Carbondale, Illinois, to see his grandmother. When he was in Carbondale, defendant knew the police were looking for him. Defendant admitted he actively evaded the police. As to the jail call, defendant testified he was an idiot and was just trying to vent.

¶ 26        During the jury instruction conference, defendant tendered an instruction for

involuntary manslaughter, a lesser-included offense. Defense counsel argued defendant did not "train the gun" on White at the time he pulled the trigger. The circuit court denied defendant's request, noting the shooting was not an accident based on the evidence presented. The jury did received instructions on first degree murder, second degree murder, and self-defense.

¶ 27 At the conclusion of the trial, the jury found defendant guilty of second degree murder. Defendant filed a motion for a judgment notwithstanding the verdict or, in the alternative, a new trial. He argued (1) the circuit court erred by refusing defendant's request for jury instructions on involuntary manslaughter, (2) the court erred in making numerous important evidentiary rulings, and (3) the verdict was against the manifest weight of the evidence.

¶ 28 At a joint May 2019 hearing, the circuit court denied defendant's posttrial motion and sentenced defendant to 20 years' imprisonment. Defendant filed a motion to reconsider his sentence, asserting (1) the amount of his sentence credit was incorrect, (2) the court erred by declining to consider statutory mitigating factors, (3) the court placed too much emphasis on the deterrent factor, and (4) the court erred by sentencing defendant as a Class X offender. After a July 8, 2019, hearing, the court modified defendant's sentencing credit but denied defendant's motion in all other respects.

¶ 29 On July 8. 2019, defendant filed a timely notice of appeal in sufficient compliance with Illinois Supreme Court Rule 606 (eff. July 1, 2017). Accordingly, this court has jurisdiction of defendant's appeal under Illinois Supreme Court Rule 603 (eff. Feb. 6, 2013).

¶ 30 II. ANALYSIS

¶ 31 A. Self-Defense

¶ 32 Defendant first asserts the State failed to prove beyond a reasonable doubt defendant did not act in self-defense when he shot White. The State contends it did prove

- 12 -

beyond a reasonable doubt defendant did not act in self-defense.

¶ 33         Our supreme court has explained self-defense as follows:

"Self-defense is an affirmative defense, and once it is raised, the State has

the burden of proving beyond a reasonable doubt that the defendant did not act in

self-defense, in addition to proving the elements of the charged offense.

[Citation.] Self-defense includes the following elements: (1) unlawful force

threatened against a person, (2) the person threatened was not the aggressor,

(3) the danger of harm was imminent, (4) the use of force was necessary, (5) the

person threatened actually and subjectively believed a danger existed that required

the use of the force applied, and (6) the beliefs of the person threatened were

objectively reasonable. [Citations.] If the State negates any one of these

elements, the defendant's claim of self-defense necessarily fails. [Citation.]

In deciding a claim of self-defense, it is the function of the jury to assess

the credibility of the witnesses, the weight to be given their testimony, and the

inferences to be drawn from the evidence. [Citation.] It is also incumbent on the

jury to resolve conflicts or inconsistencies in the evidence. [Citation.] The

standard of review is whether, after considering the evidence in the light most

favorable to the State, any rational trier of fact could have found beyond a

reasonable doubt that the defendant did not act in self-defense. [Citation.]"

*People v. Gray*, 2017 IL 120958, ¶¶ 50-51, 91 N.E.3d 876.

¶ 34         In situations like this case where the parties present evidence of both first and
second degree murder and the defendant advances a claim of self-defense, the State bears the
burden of proving beyond a reasonable doubt both the elements of first degree murder and the

defendant was not justified in using the force that he used. *People v. Jeffries*, 164 Ill. 2d 104, 128, 646 N.E.2d 587, 598 (1995). If the State fails to prove the defendant was not justified in using the force he used, then the trier of fact must find the defendant not guilty of first degree murder. *Jeffries*, 164 Ill. 2d at 128, 646 N.E.2d at 598. However, if the State successfully negates the defendant's claim of self-defense and proves the elements of first degree murder, then the trier of fact considers second degree murder. *Jeffries*, 164 Ill. 2d at 128-29, 646 N.E.2d at 598. With second degree murder, the defendant must prove that, " '[a]t the time of the killing he believe[d] the circumstances to be such that, if they existed, would justify or exonerate the killing [as self-defense], but his belief is unreasonable.' " *Jeffries*, 164 Ill. 2d at 125, 646 N.E.2d at 596 (quoting Ill. Rev. Stat. 1987, ch. 38, ¶ 9-2(a)(2)). If the trier of fact finds the defendant guilty of second degree murder, then the trier of fact has concluded the evidence only supports a finding of second degree murder and not absolute justification for the defendant's actions. *Jeffries*, 164 Ill. 2d at 129, 646 N.E.2d at 598.

¶ 35        While defendant's testimony was primarily the only direct evidence of what took place between him and White, the jury did not have to believe defendant's version of the facts. *People v. Price*, 158 Ill. App. 3d 921, 926, 511 N.E.2d 958, 961 (1987). The jury could consider other facts and circumstances in the record which tended to contradict defendant's story or raise serious questions about its probability. *Price*, 158 Ill. App. 3d at 926-27, 511 N.E.2d at 961. Here, defendant testified he had no doubt he and White were going to get into a gun fight when White lunged into defendant's car. However, defendant testified he could not see White's left hand and never testified he saw White in possession of a firearm or any other deadly weapon during the incident. Defendant also did not testify White verbally threatened him or made physical contact with him during the incident. Other evidence showed defendant was driving a

Dodge Caliber, which was a four-door hatchback and not a large vehicle. As such, when White was standing next to the passenger window of defendant's vehicle, White was in close proximity to defendant. White did not need to enter defendant's vehicle to get into a gun fight with him, as White could have shot at defendant from his position next to the car. Moreover, the location of White's bullet wound is consistent with both White lunging through the window at defendant and with White leaning up against defendant's car and talking to him through the window. Further, defendant exited his vehicle, walked around the back of the vehicle, and again fired the gun in White's direction. A jury could have found this action inconsistent with self-defense and indicative defendant was the actual aggressor and not White.

¶ 36    Additionally, defendant fled the scene and did not report the incident to the police. Instead, defendant called Bailey and asked her not to turn him into the police. He also texted "911" to Lacy. Defendant then left the area in a different car and disposed of his firearm, the shell casing, and his cellular telephone. Defendant was then on the run from police for several months. After he was arrested, he made a telephone call in jail to a friend, asking the friend to talk to Bailey and get her to tell the truth. The aforementioned facts are indicative of defendant's consciousness of guilt. Defendant contends the evidence only showed he knew he committed a crime that day. Defendant argues he may have been concerned about lesser crimes such as possession of a weapon by a felon. The jury was free to draw all reasonable inferences from the evidence, including inferring the consciousness of guilt evidence showed defendant was not acting in self-defense.

¶ 37    Here, the State presented ample evidence for a rational trier of fact to find beyond a reasonable doubt defendant's belief the circumstances justified the use of deadly force was unreasonable or that defendant was the actual aggressor.

¶ 38                          B. Involuntary Manslaughter Instructions

¶ 39          Defendant next contends the circuit court erred by refusing his request for involuntary manslaughter instructions.  The State disagrees.

¶ 40          In determining whether a defendant is entitled to a jury instruction on a lesser included offense, the circuit court considers whether some evidence was presented that, if believed by the jury, would reduce the crime charged to a lesser offense.  *People v. Eubanks*, 2019 IL 123525, ¶ 72, 160 N.E.3d 843.  The court should not weigh the evidence when deciding whether the instruction is justified.  *Eubanks*, 2019 IL 123525, ¶ 72.  We review the circuit court's conclusion the evidence was insufficient to justify the giving of a lesser included offense instruction under the abuse of discretion standard of review.  *Eubanks*, 2019 IL 123525, ¶ 72.  "A circuit court abuses its discretion when its ruling is 'fanciful, unreasonable or when no reasonable person would adopt the trial court's view.' "  *People v. Clayborne*, 2020 IL App (3d) 170518, ¶ 25, 155 N.E.3d 569 (quoting *People v. Taylor*, 2011 IL 110067, ¶ 27, 956 N.E.2d 431).

¶ 41          Involuntary manslaughter is defined as follows:

              "A person who unintentionally kills an individual without lawful justification commits involuntary manslaughter if his acts whether lawful or unlawful which cause the death are such as are likely to cause death or great bodily harm to some individual, and he performs them recklessly ***."  720 ILCS 5/9-3(a) (West 2018).

Recklessness is defined as follows:

              "A person is reckless or acts recklessly when that person consciously disregards a substantial and unjustifiable risk that circumstances exist or that a result will

follow, described by the statute defining the offense, and that disregard constitutes a gross deviation from the standard of care that a reasonable person would exercise in the situation." 720 ILCS 5/4-6 (West 2018).

"The difference between first degree murder and involuntary manslaughter lies in the defendant's mental state." *People v. McDonald*, 2016 IL 118882, ¶ 51, 77 N.E.3d 26. With intentional first degree murder, the defendant "either intends to kill or do great bodily harm to that individual or another, or knows that such acts will cause death to that individual or another." 720 ILCS 5/9-1(a)(1) (West Supp. 2017). Our supreme court has noted that, while not dispositive, the following factors may be considered in deciding whether an involuntary manslaughter jury instruction is warranted:

"(1) the disparity of size and strength between the defendant and the victim, (2) the duration of the altercation and the severity of the victim's injuries, (3) whether the defendant used a weapon, (4) whether the defendant inflicted multiple wounds, and (5) whether the victim was defenseless." *McDonald*, 2016 IL 118882, ¶ 52.

¶ 42 Defendant contends the facts of his case are similar to *People v. Beasley*, 2014 IL App (4th) 120774, ¶ 25, 9 N.E.3d 1205, in which this court found the evidence presented provided some support for an involuntary manslaughter instruction and held the trial court abused its discretion in failing to so instruct the jury. There, the evidence arguably showed the defendant was in a dispute with the victim and thought the victim was advancing and making sudden moves to harm him. *Beasley*, 2014 IL App (4th) 120774, ¶ 25. Moments before the shooting, the defendant pointed his gun at a group of people that included the victim, and the defendant shot the victim in the back. *Beasley*, 2014 IL App (4th) 120774, ¶ 25. The defendant

testified he did not intentionally fire the gun and did not intentionally point or aim it at the victim or anyone else. *Beasley*, 2014 IL App (4th) 120774, ¶ 7. When asked how the gun could have just gone off, the "defendant hypothesized it must have been a 'reaction' caused in part by his elevated fear of attack from past violent encounters in which people had shot at him." *Beasley*, 2014 IL App (4th) 120774, ¶ 7. After firing just one shot, the defendant " 'panicked' and fled the scene." *Beasley*, 2014 IL App (4th) 120774, ¶ 7. Some testimony of the other witnesses supported the defendant's testimony. *Beasley*, 2014 IL App (4th) 120774, ¶ 25. This court found the jury could have rationally accepted the defendant acted recklessly and did not intend to shoot the victim based on the evidence presented. *Beasley*, 2014 IL App (4th) 120774, ¶ 25.

¶ 43        We disagree the facts of this case are like those in *Beasley*. Here, White was the only other person in the area and was standing at the passenger side of defendant's vehicle. Defendant testified he first grabbed his firearm when White first attempted to open the car door. Defendant held the firearm with the barrel pointing towards the steering wheel. When White "launch[ed]" at him, defendant "reacted and fired towards the window." Defendant also testified he picked up the firearm, pointed it, and fired it. Defendant did deny intending to fire the gun at White. After he fired the gun, defendant got out of the car, walked around the back of his vehicle, and shot the gun again. On redirect, defendant described his act of shooting inside his car as a reflex.

¶ 44        "A defendant's testimony alone he did not intend to shoot anyone does not provide a sufficient basis for instructing on involuntary manslaughter." *Beasley*, 2014 IL App (4th) 120774, ¶ 19. Moreover, unlike in *Beasley*, defendant's testimony showed he intentionally pointed and fired the gun. If defendant had reflexively or accidently fired the gun, it would have fired at the steering wheel where defendant had it originally pointed. Defendant's testimony on

- 18 -

redirect was inconsistent with his testimony on direct and cross-examination. Moreover, we disagree with defendant's assertion the location of White's wound indicates defendant did not intentionally fire the weapon. Here, unlike in *Beasley*, no other evidence supports defendant's assertion his firing of the gun was a reflex. Defendant's testimony his shot was a reaction to White lunging at him does not change the facts he intentionally pointed the gun and fired. Illinois courts have consistently held a defendant who intended to fire a gun, pointed it in the general direction of his intended victim, and fired was not merely reckless and was not entitled to an involuntary manslaughter instruction even if the defendant asserted he did not intend to kill anyone. *People v. Minniefield*, 2014 IL App (1st) 130535, ¶ 83, 25 N.E.3d 34. Additionally, in this case, defendant did not flee immediately but, instead, exited his car, walked around it, and shot in White's direction again. The evidence showed defendant deliberately fired his firearm.

¶ 45          In the alternative, defendant argues that, if he deliberately fired the gun, some evidence showed he did so without intending or knowing his conduct would cause death or great bodily harm. However, White was lunging into defendant's car through a window, and defendant aimed at that window. Given defendant's close proximity to the victim and his aim in that direction, defendant would have known death or great bodily harm was practically certain to result. Thus, we find the circuit court did not abuse its discretion by denying defendant's request for involuntary manslaughter instructions.

¶ 46                                        C. *Voir Dire*

¶ 47          Defendant last contends the circuit court erred during *voir dire* because it failed to implement the specific question-and-response framework required by Illinois Supreme Court Rule 431(b) (eff. July 1, 2012). Specifically, he contends the circuit court impermissibly collapsed all four principles into one general proposition of law. Defendant acknowledges he

has forfeited this issue by not raising it in the circuit court and requests review under the plain-error doctrine (Ill. S. Ct. R. 615(a) (eff. Jan. 1, 1967)).

¶ 48         The plain-error doctrine permits a reviewing court to consider unpreserved error under the following two scenarios:

> "(1) a clear or obvious error occurred and the evidence is so closely balanced that the error alone threatened to tip the scales of justice against the defendant, regardless of the seriousness of the error, or (2) a clear or obvious error occurred and that error is so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process, regardless of the closeness of the evidence." *People v. Sargent*, 239 Ill. 2d 166, 189, 940 N.E.2d 1045, 1058 (2010).

¶ 49         We begin a plain-error analysis by first determining whether any error occurred at all. *Sargent*, 239 Ill. 2d at 189, 940 N.E.2d at 1059. If error did occur, this court then considers whether either of the two prongs of the plain-error doctrine has been satisfied. *Sargent*, 239 Ill. 2d at 189-90, 940 N.E.2d at 1059. Under both prongs, the defendant bears the burden of persuasion. *Sargent*, 239 Ill. 2d at 190, 940 N.E.2d at 1059.

¶ 50         Illinois Supreme Court Rule 431(b) (eff. July 1, 2012) requires the circuit court to do the following:

> "ask each potential juror, individually or in a group, whether the juror understands and accepts the following principles: (1) that the defendant is presumed innocent of the charge(s) against him or her; (2) that before a defendant can be convicted the State must prove the defendant guilty beyond a reasonable doubt; (3) that the defendant is not required to offer any evidence on his or her own behalf; and

(4) that if a defendant does not testify it cannot be held against him or her;

however, no inquiry of a prospective juror shall be made into the defendant's

decision not to testify when the defendant objects.

The court's method of inquiry shall provide each juror an opportunity to

respond to specific questions concerning the principles set out in this section."

Our supreme court has held Rule 431(b) "mandates a specific question and response process."

*People v. Thompson*, 238 Ill. 2d 598, 607, 939 N.E.2d 403, 409 (2010).  It explained the process

as follows:

"The trial court must ask each potential juror whether he or she understands and

accepts each of the principles in the rule.  The questioning may be performed

either individually or in a group, but the rule requires an opportunity for a

response from each prospective juror on their understanding and acceptance of

those principles."  *Thompson*, 238 Ill. 2d at 607, 939 N.E.2d at 410.

We review *de novo* whether the circuit court complied with Rule 431(b).  *People v. Wilmington*,

2013 IL 112938, ¶ 26, 983 N.E.2d 1015.

¶ 51        Here, the circuit court recited the Rule 431(b) principles in the following manner:

"[T]he four of you understand that the defendant is presumed to be innocent of the

charges against him; that before the defendant can be convicted, the State must

prove him guilty beyond a reasonable doubt; that the defendant is not required to

offer any evidence on his own behalf, and that if the defendant does not testify,

that fact cannot be held against him in any way."

The court then asked each panel of four jurors if they understood those instructions, and they all

answered individually in the affirmative.  The court next asked the jurors if they accepted those

instructions, and they all again individually answered in the affirmative.

¶ 52　　　　In support of his contention the circuit court's procedure was erroneous, defendant cites *People v. Hayes*, 409 Ill. App. 3d 612, 627, 949 N.E.2d 182, 195 (2011). See also *People v. Johnson*, 408 Ill. App. 3d 157, 171, 945 N.E.2d 610, 623 (2010) (concluding the circuit court erred by combining the first three principles of Rule 431(b) into one broad principle and omitting the fourth principle). In *Hayes*, 409 Ill. App. 3d at 627, 949 N.E.2d at 195, the Appellate Court, First District, found the circuit court erred by combining the first three principles of Rule 431(b) into one broad principle, which did not allow the potential jurors to acknowledge they understood and accepted each of those principles.

¶ 53　　　　However, in *People v. Willhite*, 399 Ill. App. 3d 1191, 1196-97, 927 N.E.2d 1265, 1269-70 (2010), this court found the reading of the four specific principles followed by asking the potential jurors if they understood and accepted the four principles did comply with Rule 431(b). We noted Rule 431(b) has no requirement the circuit court ask separate questions of the potential jurors about each individual principle. *Willhite*, 399 Ill. App. 3d at 1196-97, 927 N.E.2d at 1270. In *People v. Staple*, 402 Ill. App. 3d 1098, 1108, 932 N.E.2d 1064, 1073 (2010), this court also found no error in reciting the four principles to the venire and then inquiring into the jurors' understanding and acceptance of those principles in small groups. See also *People v. Wallace*, 402 Ill. App. 3d 774, 777, 932 N.E.2d 635, 637 (2010) (finding the circuit court complied with Rule 431(b) by following its pronouncement of the four principles with a timely questioning as required by Rule 431(b)). More recently, in *People v. Kinnerson*, 2020 IL App (4th) 170650, ¶ 62, we again found the circuit court's questioning of potential jurors by reciting the four principles at one time before asking the questions complied with both Rule 431(b) and *Thompson*.

¶ 54 Defendant contends this court should reconsider its decision in *Kinnerson*. We decline to do so because neither the rule itself nor the supreme court's decision in *Thompson* requires the Rule 431(b) principles to be addressed separately. The *Thompson* court emphasized a potential juror must be asked whether he or she understands and accepts each of the Rule 431(b) principles and given an opportunity to respond. *Thompson*, 238 Ill. 2d at 607, 939 N.E.2d at 410. In this case, the circuit court did so, and thus we do not find any error. As such, we do not address defendant's plain-error argument.

¶ 55                                    III. CONCLUSION

¶ 56 For the reasons stated, we affirm the Champaign County circuit court's judgment.

¶ 57 Affirmed.